### In the Matter of Bartley L. MICKLER, Debtor.

**Bankruptcy No. 80–1226.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 11, 1986.

Don M. Stichter, Tampa, Fla., for debtor.

Domenic Massari, Tampa, Fla., for Helen Wood.

## ORDER ON OBJECTION TO CLAIM OF HELEN J. WOOD

ALEXANDER L. PASKAY, Chief Judge.

THE MATTER under consideration in this Chapter 11 case is an Objection to the Claim of Helen J. Wood (Wood) filed by the Debtor, Bartley L. Mickler (Debtor). The Debtor contends that the claim is not based on a valid and enforceable debt against the Debtor and, therefore, should be disallowed. The facts relevant to a resolution of this controversy are as follows:

Throughout the relevant period and through the present, the Micklers were the owners of a large tract of ranch land located in West Pasco, Florida. The Debtor acquired approximately 5,000 acres from his father in the 1940's but by 1978 his holdings had shrunk to 1,600 acres. In 1976 the Micklers began to experience financial difficulties and began to explore the possibility of producing income through the development of that portion of the land which fronted on Highway 19 in Pasco County. In order to further his plan to develop the land, the Debtor entered into an agreement with W.E. Strother, Jr. (Strother) and John Barry Allen (Allen) who agreed to prepare a detailed master plan for the development of the land. The first phase of the master plan was to include a retirement village, a commercial shopping center, and an entertainment complex including a dinner theater.

In furtherance of the plan, Strother arranged a public meeting at the Holiday Bank in Tarpon Springs, Fla. to assess the public reaction to the proposed plans. En-

couraged by the positive response, Strother arranged for Mickler to meet Helen J. Wood (Wood), a realtor whom he knew to have an advantageous business association with Food Fair. At the meeting in March, 1977, Mickler and Strother discussed the master plan with Wood. Although Wood was not employed at that time, Mickler told her that Strother was the project manager and that she should deal through Strother and that Strother had full authority to act on his behalf. Strother contacted Wood within a few days of the meeting and informed her of his and Mr. Mickler's decision to utilize her services in connection with the proposed project.

At the time Wood started to work on the project, she was a broker-salesperson associated with Tampa Homes, Inc., a realty firm. The first written Commission Agreement executed by Mickler on September 9, 1977 was with Wood and Tampa Homes, Inc. The Agreement provided, inter alia, that the Commission Agreement would remain in force only as long as Wood was employed by Tampa Homes, Inc., and that Tampa Homes would have no claims to any commissions for services rendered to Mickler by Wood except during the period of Wood's employment by Tampa Homes (Debtor's Exh. # 8). On the same date, Mickler signed a second Commission Agreement involving the same parties and containing the same provisions regarding termination as the first Agreement.

While the first Agreement dealt with procuring leases in general, the second Agreement dealt specifically with Wood's proposed efforts to bring together the Debtor and Food Fair Stores, Inc. and to locate real properties for the development of shopping centers. It provided for Tampa Home's recovery of a commission upon the successful location and purchase of acceptable shopping center sites. (Debtor's Exh. # 9).

The record reflects that on September 14, 1977 Wood terminated her association with Tampa Homes, Inc. and that on October 1, 1977, she renewed her broker-sales-man license with Leslie Blank, Inc., another real estate firm.

On February 6, 1978 Bartlain, Inc. (BL, Inc.), a wholly owned corporation by Mickler and his wife, Wood, and Leslie Blank, Inc. entered into a third Commission Agreement (Third Agreement). The pertinent provisions of the Third Agreement may be paraphrased as follows:

(I) Blank had no claim to any commissions for services rendered to BL, Inc. by Wood except during the period of Wood's employment by Blank.

(II) Wood would be the exclusive leasing agent making all reasonable and best efforts to lease available space in all leasable premises owned by, managed by, or in which an interest was held by BL, Inc. The commission consisted of 5% of the rent collected by the lessor from lessees as part of the lease and were *to be paid to Blank at the time of payment by the leasee to BL, Inc.* (Emphasis supplied)

(III) Wood was granted the exclusive right to serve as BL, Inc.'s agent in locating real property for the development of shopping centers and provided for a 5% commission upon the successful location and subsequent purchase of a site.

(VII) The term "BL, Inc." was defined to include all businesses connected with the development of shopping centers in the State of Florida by Bart Mickler.

(X) Real estate commissions for leases covered by the Agreement would not be payable to Wood unless the lease was acceptable to the permanent lender or lenders as the case may be. (Debtor's Exh. # 3).

On August 25, 1978 Wood's broker-sales-man license was reissued due to a corporate name change from Leslie Blank, Inc. to Charles M. Banks, Inc. and it remained so registered with the Division of Real Estate, Department of Professional Regulation of the State of Florida until January 2, 1979 (Debtor's Exh. # 1) when her license was reissued as an individual broker. The record further reflects that Mickler did

pay some commissions to Leslie Blank, Inc., although the basis for the payment is unclear. Leslie Blank, Inc., in turn, made commission payments to Helen Wood out of the commission paid to it by Mickler.

Pursuant to her agreements to use her best efforts, Wood spent some 3,500–4,000 hours in negotiating leases for the proposed shopping center and purchase and sale of real estate. A significant portion of that time was spent in what this Court finds to be in the nature of consultant work, i.e. outside the normal scope of the activity assumed by a real estate salesperson. The consultant work included Wood's efforts in obtaining a wet zoning for the property; the groundwork needed to obtain a liquor license; work in obtaining consents of adjacent land owners to easements needed for the construction of a road and for the erection of a traffic light on U.S. Hwy. 19, all of which were essential to the development of the project.

It was during the period when the Third Agreement was in effect that her efforts to lease and sell portions of the Debtor's property first began to bear fruit. Wood was instrumental in obtaining a lease with Food Fair, a lease accepted by Mickler. The lease was contingent upon meeting a condition insisted upon by Food Fair that a major developer would build a residential project behind the shopping center. Wood was requested by Mickler to pursue that project as well.

In pursuing this phase of the project, Wood located U.S. Home, a builder of residential homes, which eventually entered into an agreement with Mickler (Creditors Exh. # 7A) which would have been the beginning of the residential project urged by Food Fair. Unfortunately, in the interim Food Fair filed bankruptcy. The lease was rejected by Food Fair during its Arrangement case pending in Philadelphia and, as a result, the first, and as it turned out, the last flagship tenant fell by the wayside.

By 1979, Wood obtained signed leases from Publix and Walgreens and was negotiating space for McCrorys, S & S Cafeteria, and some others. She lined up a number of prospective tenants for the remaining square footage in the proposed shopping center spaces reserved for smaller tenants. Pursuant to Strother's instructions, she delayed signing leases with smaller tenants pending groundbreaking. The agreement with U.S. Home was executed by Mickler on February 24, 1978 and consisted of a rolling option contract under the terms of which U.S. Home paid Mickler $50,000 in earnest money and received a renewable six month option on designated Mickler properties. The contract provided for a 5% commission to be paid to Wood and she was, in fact, paid a partial commission out of the earnest money paid to Mickler (Debtor's Exh. # 5).

Despite the contract with U.S. Home, Mickler entered into two contracts conveying some of the land covered by the U.S. Home Contract to Holiday Gulf Builders. As a result, U.S. Home cancelled its option contract and demanded the return of the earnest money.

In January of 1979 Wood obtained a lease with Publix which Mickler executed. As a result of delays in construction, Publix insisted on an addendum to the lease. Mickler refused to sign the requested addendum or, in fact, to take any further action to proceed with the master plan, which at this point appeared to have been abandoned.

The record is replete with extensive, albeit highly conflicting, evidence as to the reason for the failure of the plan: Mickler contends that the failure of the project was the result of the conduct of Strother in general and his inability to obtain the financing necessary to launch the project; that he did not understand the agreements he was signing and that the terms of the agreements were misrepresented to him by Strother. Wood contends that Mickler arbitrarily and capriciously frustrated first the sale to U.S. Home and also the entire project and, in turn, ultimately, the loss of the leases she had obtained for him.

The first component of Wood's claim is for her commission under the terms of the

sale contract to U.S. Home in the amount of $48,000 which would constitute a 6% commission on the 160 acres contemplated by the contract, or, at the very minimum, in the amount of $15,000, a 6% commission on the 50 acres U.S. Home was entitled to select as security for their earnest money (Wood's Exh. # 7A).

Mickler objects to Wood's right to commission on the U.S. Home contract on a number of grounds which include the following: (1) no sale ever occurred; (2) the contract was not a final contract because it did not include all essential terms of a proposed sale; (3) one of the conditions set forth in the February 24 letter of intent, i.e. the approval of the purchase by U.S. Home's Board of Directors was not satisfied; and (4) Wood never obtained a written listing agreement to sell any of Mickler's property.

Before considering these objections, however, it is necessary to address a threshold question and a preliminary objection raised by Mickler, i.e. that Wood is precluded under Florida law from collecting any commission from Mickler because she was not the broker of record at the time the commission claimed was earned. The right to real estate commission is governed by Fla. Stat. § 475.42(1)(d) (1983) which provides in pertinent part as follows:

> No salesman shall collect any money in connection with any real estate brokerage transaction, whether as a commission, deposit, payment, rental, or otherwise, except in the name of the employer and with the express consent of the employer; and no real estate salesman, whether the holder of a valid and current license or not, shall commence or maintain any action for a commission or compensation in connection with a real estate brokerage transaction against any person except a person registered as his employer at the time the cause of action is alleged to have arisen.

This rule is restated in the Florida Real Estate Commission Handbook, where it stated in § 10.20, at p. 280 that:

> An active salesman ... cannot collect any money as commission, deposit, payment, rental, or otherwise in connection with a real estate brokerage transaction except in the name of and with the express consent of his employer.... the salesman employed in such manner cannot bring an action for commission or compensation against anyone other than the person who was his employer at the time the cause of action is alleged to have arisen. (Debtor's Exh. # 2)

Wood attempts to circumvent the operation of § 475.42 by her assertion that she was a "broker-salesman" as opposed to simply a "salesman". In addition, Wood asserts that it is clear in all transactions that she operated as an "independent contractor" and that her employers acknowledged her right to collect commissions on her own behalf after her termination from the two entities by which she was employed.

Mickler contends that the role of the real estate agent in a particular negotiation should be determinative, regardless of whether the agent may have or is qualified to have a broker's license, citing *Fuller v. Alberts*, 382 So.2d 113 (2d DCA Fla.1980). Further, Mickler contends, that in any event Wood's status is defined by Florida law to be that of a salesman rather than an independent contractor, i.e. a broker. Fla. Stat. § 475.01(1)(e) defines "broker-salesman" as follows:

> (e) "Broker-salesman means a person who is qualified to be issued a license as a broker *but who operates as a salesman in the employment of another*". (Emphasis supplied)

Wood's standing to assert her claim for commission is, obviously, a threshold question which should be considered before determining Mickler's obligation under the contract with U.S. Home. The record is clear that the U.S. Home contract was executed on February 24, 1978 and that, under its terms, it contemplated a sale, if at all, within six months of that date, i.e. on or before August 24, 1978. As noted above, throughout that period, Wood was em-

ployed by Leslie Blank, Inc. as a salesperson and, although the name was changed, she was with the same entity until January 2, 1979 in the same capacity and did not act as an independent broker (Debtor's Exh. # 1). The Letter of Intent (Wood's Exh. # 7A) which forms the basis for Wood's claim to commissions on the U.S. Home transaction plainly contemplates a 5% brokerage fee to be paid to the brokerage firm of Leslie Blank, Inc. "as the firm which employs Helen Wood on an independent contractor status, as the broker-salesperson who has been the procuring cause of this entire transaction". The fee was to be paid upon each sale by Mickler to U.S. Home of the property which is the subject of this Letter of Intent.

Based on the foregoing, this Court is satisfied that Wood was a salesperson employed by Leslie Blank, Inc. within the meaning of Fla.Stat. 475.42(1)(d) despite her assertion that she operated as an independent contractor, particularly in light of Fla.Stat. 475.42(1)(b) which prohibits any person licensed as a salesman from operating as a broker or operating as a salesman for any person not registered as his employer. Wood's protestation that she had a valid brokers license and that she could open her own brokerage business at any time is without legal significance. She was not registered nor authorized to do so at the relevant time and, consequently, she has no standing to prosecute a claim against Mickler for commissions on the U.S. Home contract. It is unnecessary, therefore, to address the remaining issues raised pertaining to that contract.

The next component of Wood's claim relates to commissions she asserts were earned under the Commission Agreement executed by BL, Inc., Helen J. Wood, and Leslie Blank, Inc. on February 6, 1978 (Debtor's Exh. # 3). Wood acknowledges, as she must, that paragraph (II) of the Commission Agreement provides, in pertinent part, as follows: "Wood shall be the exclusive leasing agent and make all reasonable and best efforts to lease the available space in all *leasable premises* owned by, managed by, or in which an interest is held by BL, Inc. Commission to BLANK/WOOD shall be paid as follows:

A. BL, Inc. agrees to pay BLANK a commission of five (5) percent of the rent collected by lessor from lessee as part of his lease, including base rent, overage, expansion, or any other source attributable to said lease, for the initial term of the lease.

B. The commissions shall be paid to BLANK at time of payment by lessee to lessor BL, Inc., but in no case shall they be paid less often than every three (3) months. If commissions are not paid within thirty (30) days of date they are due to be paid to BLANK as per their agreement, it shall be considered a default and BLANK or WOOD shall have the option to declare the total commission to be earned in the full lease period due and payable."

Despite the fact that the agreement relates to "leasable premises" owned by ... BL, Inc., and that the commission is to be paid when BL, Inc. receives the rent from the lessees and that the commission is based on a percentage of the rent collected, Wood contends that those conditions are excused and the Commission Agreement should be enforced because it was Mickler's own interference and/or failure to act which caused the shopping center financing and construction to fail, thereby frustrating the foundations of the Commission Agreement.

She asserts that the shopping center project was initially delayed by Mickler's unwillingness to sign documents and his failure to execute lease agreements with the major tenants and was finally put to rest by his insistence that a strip of land be preserved through the prospective shopping center so that his cows could graze. She contends that although the fund from which her commission was to be paid, i.e. rents collected by the lessor, BL, Inc., was a condition precedent to liability; one who prevents the performance of a condition precedent excuses the other parties performance. *Paul v. Hurley,* 315 So.2d 536

(Fla. 4th DCA 1975). The prevention, in fact, amounts to a breach of contract and the obstructing party cannot use the failure of a condition precedent to avoid liability. *Sharp v. Williams*, 141 Fla. 1, 192 So. 476 (1939); *Babe, Inc. v. Baby's Formula Service*, 165 So.2d 795 (Fla. 3rd DCA 1964); *Gulf American Land Corp. v. Wain*, 166 So.2d 763 (Fla. 3rd DCA 1964). See also *Cohen v. Mohawk*, 137 So.2d 222, 224 (Fla. 1962); *Ballas v. Lake Weir Light and Water Co.*, 100 Fla. 913, 130 So. 421 (1930). Therefore, contends Wood, the contract was anticipatorily repudiated and she is entitled to collect the commissions earned. Based upon the contracts executed by proposed lessees and other firm committments by proposed lessees, Wood calculates her lost commissions to total $445,325 based on minimum rents.

Anticipating that commissions claimed on contracts which are as yet unsigned may be objected to as being too speculative, Wood, alternatively, seeks compensation in quantum meruit, citing *Fred Howland, Inc. v. Hollywood Tile and Terrazzo Company*, 207 So.2d 700 (Fla. 4th DCA 1968) and *E.A. Strout Farm Agency v. DeForest*, 192 A.D. 790, 183 N.Y.S. 119 (1920) for the proposition that one may recover in quantum meruit when the other party prevents performance or renders performance impossible. Wood testified that she spent 4,000 hours working on the shopping center project, that she received $75.00 per hour on similar leases, and that she is entitled in quantum meruit to recover $300,000.

The standing issue does not arise in this context because Wood was a self-employed, registered broker at the time the obligations under the Third Commission Agreement would have begun. Mickler objected to Wood's claim to commissions on several other grounds. The first is that it is contended by Mickler that the Commission Agreement contemplated, as a condition precedent to recovery of any commissions, the existence of a shopping center, noting that the agreement at paragraph two refers to "leasable premises owned by.... BL, Inc.". That condition, Mickler claims, is an inseverable part of the contract and, since the shopping center was never constructed, there were no leasable premises ever built, therefore, the condition failed and the contract is unenforceable. There is convincing evidence in this record to warrant the conclusion that the Commission Agreement would properly be classified as an "at risk" contract, or one in which the broker took the risk that the shopping center would never be constructed and, if no leasable premises ever came into existence, no commission would be earned.

Mickler's second objection is based on paragraph (X) of the Commission Agreement which specifically provides that commissions would not be payable to Wood unless the lease was acceptable to the permanent lender or lenders as the case may be and the record is clear that there was never any permanent loan committment made by a lender nor any loan actually made. Mickler refutes the contention of Wood that Mickler himself defeated the conditions precedent to the contract, pointing out Strother's conduct in negotiating financing for the project and Mickler's refusal to cooperate with Strother.

Finally, Mickler challenges Wood's claim for recovery on a quantum meruit theory, contending that where the parties agree that a brokerage commission is to be paid only on the satisfactory completion and execution of the underlying transaction, the broker cannot recover on a quantum meruit theory, notwithstanding the broker's contention that the other party prevented it from successfully completing the contract, citing *Harbour Inn, Inc. v. Kagan*, 343 So.2d 1353 (Fla.2d DCA 1977). In *Harbour Inn* the Court recognized the general principle that "one who prevents or makes impossible the performance or happening of a condition precedent upon which his liability by the terms of the contract is made to depend cannot avail himself of its non-performance", but refused to apply that rule in the face of a specific agreement to the contrary.

It should be pointed out at the outset that the Third Commission Agreement·was between BL, Inc., Wood and Leslie Blank, Inc. to which Mickler, the Debtor, was not a party and there is no evidence in this record that Mickler individually guaranteed this Third Commission Agreement. Be that as it may, the Court need not consider this point.

As noted above, neither of the parties contend that all of the conditions precedent to Mickler's obligation under the Commission Agreement were satisfied. The question is whether they were excused by interference or inaction on Mickler's part. While it is true that Wood, at the request of Mickler, spent a considerable amount of time attempting to procure leases, and, in addition, performed several additional chores accepted by Mickler, albeit not expressly, the fact remains that her work, with one exception, did not produce any tangible benefit to Mickler.

This Court cannot accept the proposition urged by Wood that her efforts to succeed were frustrated by Mickler's failure to sign papers. The fact of the matter is that the project failed simply because Strother was not able to secure financing to launch the project, let alone to complete the project.

Wood's final contention, that the project failed to succeed because Mickler insisted on retaining land which would permit his cattle to cross U.S. 19, also known as "Suicide Alley" is absurd. As bizarre as this proposition may sound, even if true, it certainly was not a meaningful contributing factor to the ultimate demise of the project, which was nothing else but the inability to obtain the necessary financing.

Further, the Commission Agreement at paragraph (X) specifically conditioned the payment of commissions upon a committment of a permanent lender or lenders to furnish the funds needed. The language is eminently clear that the Commission Agreement intended to reserve approval of the lease agreements by permanent lenders. It is well established under Florida law that when a party has specifically reserved unto itself the right to veto a sale based on the terms and conditions presented to it, that reservation of discretion implies the right to withdraw from a proposed sale at any time until a binding agreement has been reached and that such language places a broker on notice that he or she will not be entitled to a commission until the seller has actually agreed to the terms by entering into a binding contract to sell. *Hanover Realty Corp. v. Codomo*, 95 So.2d 420 (Fla.1957); *Mark v. Hahn*, 177 So.2d 5, 8 (Fla.1965); *P.C. Price v. Rogers Enterprise*, 418 So.2d 1243 (Fla. 4th DCA 1982).

■ This Court fails to perceive any reason to distinguish the reservation of approval of terms and conditions to the seller (lessor) and the reservation of approval to permanent lenders. The Commission Agreement before this Court clearly put Wood on notice that her efforts to lease the non-existent shopping center were at her own risk through approval of the terms and conditions of the leases by permanent lenders. That approval not being forthcoming, there is no entitlement to commissions under the terms of the agreement or on a quantum meruit basis. *Harbour Inn, Inc. v. Kagan*, 343 So.2d 1353 (Fla. 2d DCA 1977).

■ This Court is satisfied, however, that Wood was asked to perform a number of services in the nature of consultation, far beyond the scope of her responsibilities as a real estate broker or salesman. These include her efforts in obtaining rezoning, laying the groundwork to obtain a liquor license, and obtaining consents of adjacent landowners to the stop light and access roads which would be necessary for the prospective shopping center. It is clear that Strother had, if not actual authority, apparent authority to assign these projects to Wood. The record amply demonstrates that both Mickler and Strother were aware of Wood's expertise and advantageous connection and it is incredible that they would assume that Wood would perform the consultant services without any compensation.

Mickler knowingly and willingly accepted the benefits resulting from Wood's services, albeit most of them are minimal in light of the ultimate demise of this grandiose project. Nevertheless, it would be grossly unfair and inequitable to deny Wood compensation completely. She is entitled to be compensated on a quantum meruit basis, not as a payment of commissions for leases or sales of real estate but for her services as a consultant. Unfortunately it is difficult to determine the reasonable value for these services since there is little basis on this record to separate the time expended in her capacity as a broker versus consultant. After reviewing the voluminous time records, this Court is of the considered opinion that the value of the consultant services for which Wood is entitled to payment is $25,000.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Debtor's Objection to the Claim of Helen J. Wood be, and the same is hereby, sustained in part and overruled in part and the claim is allowed in the reduced amount of $25,000.