In re Lawrence C. SAWYER and
Angela Sawyer, Debtors.

Hubert N. WALTERS, Plaintiff,

v.

Lawrence C. SAWYER, Angela Sawyer
and Marjorie Aurigema,
Defendants.

Bankruptcy No. 090–70848–21.
Adv. No. 091–7015–21.

United States Bankruptcy Court,
E.D. New York.

June 21, 1991.

Alan Pressman, Central Islip, N.Y., for debtors/defendants.

Pryor & Mandelup by Randolph E. White, Mineola, N.Y., for plaintiff.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

This is an adversary proceeding brought by Hubert Walters against the Debtors, Lawrence Sawyer and Angela Sawyer, his wife, and Marjorie Aurigema. Walters objects to the discharge of the Debtors under 11 U.S.C. § 727(a)(2) and (4) and to the dischargeability of Sawyer's debt to him under 11 U.S.C. § 523(a)(2), (4) and (6).[1] Aurigema defaulted as did Angela Sawyer originally, but the latter was later allowed to join in her husband's Answer.

## FINDINGS OF FACT

1. Lawrence Sawyer is an experienced chef who in 1988–1989 was operating a take-out restaurant under the name "Southern Taste." This was the same name as that of a corporation organized by Sawyer in 1987 in which he and his wife were the sole stockholders, Sawyer holding 51 percent of the shares and his wife 49 percent.

2. Sometime prior to May 1st, 1989, Sawyer and the plaintiff, Hubert Walters, who was then employed as a policeman, agreed that they would form a partnership for the purpose of operating a sit down restaurant serving southern style cooking. The restaurant was to operate on premises which Sawyer undertook to locate and buy. The partnership was not to participate in buying or carrying the building and the costs associated with it.

3. Sawyer located suitable premises sometime prior to May 1, 1989, at 1011 and 1013 Islip Avenue, Central Islip, New York (the "Islip Avenue Premises"). The premises included a building suitable for the restaurant and another house leased to three tenants with a rent roll of $800 per month.

4. On May 1, 1989, Sawyer and Walters signed "Articles of Co–Partnership" drawn up by Lawrence Sawyer. These provided that the two men:

> Will share partnership in the business named Southern Taste restaurant, located at 1011 Islip ave., Central Islip. Both partners will give the amount of $20,000 as invested assets in the business. The profit, if any, will be paid as salaries to each partner after expenses are deducted, profit or losses are to be shared as follows, Lawrence Sawyer will receive 60% of the profit and Hubert Walters will receive 40% of the profit as agreed. The duties and obligation of each partner will be the management of said restaurant. At least 8 hrs. will be devoted to the business. Bank accounts will be opened in the name of southern taste, Each partners signature must be on all checks paid out to accounts payable and all bills, Except in the case of payroll checks, one signature will be sufficient. ... This will be a three year contract agreement, expiring on May 1, 1992, at that time said partners will renegotiate a new contract. [sic]

(Plaintiff Ex. 2)

5. Even before the agreement was signed, Walters, on April 24, 1989, had

---

1. Section 727(a)(2) covers transfer or concealment of property with the intent to hinder, delay or defraud creditors; Section 727(a)(4) relates to false oath; Section 523(a)(2) reaches actual fraud; Section 523(a)(4) applies specifically to fraud by one in a fiduciary capacity and Section 523(a)(6) covers willful and malicious injury to persons or property.

given Sawyer a check for $13,000 towards his investment in the partnership. (Plaintiff Ex. 15). He paid the remaining $7,000 to Sawyer at a later time. Sawyer deposited the $13,000 check into his personal account at European American Bank (Account—No. 087–431771) which Sawyer held jointly with his wife.

6. On May 23, 1989, Sawyer contracted, in the name of Southern Taste, Inc., to purchase the Islip Avenue Premises for $325,000, the seller, Gloria McCarthy agreeing to take back a purchase money mortgage on the premises. (Plaintiff Ex. 20).

7. On May 30, 1989, Sawyer opened a checking account at European American Bank (Account—No. 087–03232–2), in the name of Southern Taste, Inc., for the business. (Plaintiff Ex. 5).

8. That same month, May 1989, Walters, in reliance upon his partnership with Sawyer, retired from the police department where he had been for many years.

9. At the end of 1988 or the beginning of 1989, Sawyer sold the take out restaurant he had been operating for a total sale price of $60,000.

10. In November 1989, Sawyer applied to the National Westminster Bank for a $200,000 Small Business Administration Loan ("SBA Loan") on behalf of Southern Taste, Inc. the business of which was described as a "Restaurant." (Plaintiff Ex. 25). In support of the application he submitted an appraisal of the Islip Avenue Premises, attributing a value to those premises of $420,000. (Plaintiff Ex. 13).

11. In support of the loan Sawyer submitted a financial statement signed by himself and his wife. (Plaintiff Ex. 24). This financial statement showed a residence with a value of $140,000 and a mortgage of $85,000; a life insurance policy with a cash surrender value of $50,000; an automobile with a value of $20,000; and 210.78 shares of NYNEX stock having a total value of $20,000.

12. Sawyer told the Bank's loan officer that he had sold his previous place of business for $64,000.

13. The SBA loan was requested to buy property, inventory and to supply working capital. When the loan was approved, the bulk of the money was used to purchase the Islip Avenue Premises. Lawrence Sawyer, however, received $34,899.50, presumably as working capital. (Defendant Ex. G). Sawyer personally guaranteed the loan. The Bank took back a first mortgage on the Islip Avenue Premises.

14. On March 7, 1990, the corporation Southern Taste, Inc. took title to the Islip Avenue Premises. (Plaintiff Ex. 21). Extensive renovations had been going on, paid for out of the bank account maintained in the name of Southern Taste at European American Bank.

15. Walters sought to buy into the corporation, Southern Taste, Inc., but Sawyer told him that its value was in excess of $80,000.

16. On March 27, 1990, Walters wrote feelingly on the calendar he was maintaining for the business, "Open at last." But his pleasure was destined to be short-lived. (Plaintiff Ex. 8). Within six months Sawyer had arranged to exclude him completely from the business.

17. Before the restaurant opened, Sawyer had told Walters that in order for them to make a profit it would be necessary for receipts to total $10,000 per month. Accordingly, they set a goal of $2,500 per week, which they achieved almost immediately.

18. Their method of keeping accounts was very simple. Each day Walters would enter into a notebook, which was kept on the premises at all times, the day's receipts and the expenditures. (Plaintiff Ex. 6A, 6B). These figures would be tallied at the end of the day or week, enough taken out to be deposited in the European American Bank account to cover outstanding obligations and the balance divided 60 percent to Sawyer and 40 percent to Walters.

19. In the restaurant's first month of operation, its receipts exceeded $15,000. Each week in April, the revenues from the restaurant substantially exceeded $2,500 and in two out of the four weeks in April

they substantially exceeded $4,000. (Plaintiff Ex. 16).

20. Despite the success of the restaurant, Sawyer, in April 1990, began contemplating bankruptcy, never mentioning this to his partner, Walters. Bankruptcy appears to have been one facet of a multi-part scheme which had as its objective ousting Walters from his share of the restaurant business. To carry out this scheme, Sawyer began surreptitiously transferring assets to Marjorie Aurigema with whom he enjoyed a close personal relationship.

21. On May 1, 1990, Sawyer personally signed a lease with Marjorie Aurigema, leasing her the premises on which the restaurant was being conducted. (Plaintiff Ex. 3). The lease was for a five year term and called for ever increasing rentals beginning at $18,000 the first year and going up to $25,000 in the fifth year. Ms. Aurigema never paid any part of this rental. Walters knew nothing of the lease at the time. Ms. Aurigema had been introduced to Walters, approximately six months earlier, as someone who would help with the decorating. When the restaurant opened, she acted as hostess and took orders at the counter. She also acted as cashier, ultimately working at the cash register as much as Walters did.

22. At the same time that Sawyer leased the premises to Aurigema, he facilitated her application for a liquor license for the premises, signing the Landlord Identification form she required. (Plaintiff Ex. 4). Walters, likewise, was not advised that the liquor license for the restaurant was going to be issued to Aurigema.

23. The same month that Sawyer arranged the lease and the liquor license, he consulted, on May 14, 1990, with bankruptcy counsel.

24. On June 13, 1990, he and his wife voluntarily filed under Chapter 7. Walters was told nothing respecting the filing, even though under New York law filing for bankruptcy automatically dissolves a partnership. Sawyer continued exactly as before, sitting down with Walters, week after week, to enter the receipts and divide the proceeds in accordance with their partnership agreement.

25. The bankruptcy petition, signed by both Mr. and Mrs. Sawyer, lists nine creditors, representing for the most part credit card debts, but including the $200,000 SBA loan from National Westminster Bank and the amount owed Rogers & Taylors who had appraised the Islip Avenue Premises. Walters is not named as a creditor and consequently received no notice of the bankruptcy filing.

26. In the Debtors' schedules, the only real property listed is the marital residence which is stated to have a value of $115,000 and mortgages totalling $114,000. Schedule B–2 calls for the disclosure of all items of personal property owned by the debtors. The Debtors denied owning any tangible, personal property of any value other than $100 in a checking account in the National Westminster Bank, household goods and wearing apparel and a 1986 Renault. They said they owned no equipment or supplies, no inventory, no government or corporate bonds, no interest in insurance policies and no stock except in Southern Taste.

27. Schedule B–2 explicitly inquires as to any "Interest in partnerships." "0" was the answer given to this inquiry.

28. At the end of Schedule B–2, which calls for property of any kind not otherwise scheduled, the following entry appears: "All shares of outstanding stock in Southern Taste, Inc. (corporation has no equity in any assets)." The stock was assigned a value of zero.

29. In the Schedule of Current Income and Current Expenditures, Sawyer described himself as a "[r]estaurant owner and operator" and listed his estimated average currently monthly income from the operation of a business or profession as $800. Asked for any other income from real estate or personal property, the response was left blank.

30. In the "Statement of Financial Affairs for Debtor Not Engaged In Business" Sawyer answered "restaurant owner," in response to the question as to what is his occupation; asked where he is now employed, he answered "Southern Taste,

Inc."; asked whether he had been in partnership with anyone or engaged in any business during the six years immediately preceding the filing of the original petition herein, he answered, "yes; Southern Taste, Inc., purchased approx six mos ago and opened approx two mos ago; restaurant and land located at 1011 Islip Avenue, Route 111, Central Islip, NY, Debtors are sole shareholders." [sic] Asked whether he kept books of accounts or records relating to his affairs within the two years immediately preceding the filing of the original petition, he answered, "No." In the Statement of Executory Contracts, when asked whether he had any executory contracts, he responded, "None."

31. Despite the fact that Sawyer's partnership interest belonged to his Chapter 7 Trustee as part of the Chapter 7 estate, Sawyer, after filing the petition, carried on exactly as before as though nothing had changed.

32. Walters found himself increasingly being replaced at the cash register by Aurigema, who had assumed a position of authority in the restaurant with respect to the other employees from the time the restaurant opened.

33. The original hours of the restaurant were from 11:00 a.m. to 10:00 p.m. They were changed in July so that the restaurant was only open from 5:00 to 10:00 p.m. The ostensible reason for the change in the operating hours was that there was some difficulty with the cesspool which was preventing the restaurant from getting an operating license. Sawyer told Walters that by operating the restaurant at night, inspection by the authorities would be avoided. Approximately $15,000 was needed to correct the sewerage problem.

34. Around the same time, Jazz Nights were initiated, which carried a cover charge for each customer of $5.00. Sawyer suggested to Walters that he cover the restaurant during the early hours, so that as a result, he was unable to observe exactly how much money the restaurant was making or what money was taken in on Jazz Nights.

35. Walters also discovered that Sawyer was performing catering functions and arranging parties in the restaurant for which he was not accounting to the partnership. When Walters remonstrated, Sawyer answered that the catering was the result of his work, that he had supplied the materials and he was going to keep the money himself. In the end of July, 1990, Walters arrived at the restaurant prior to when his shift was to begin. He observed in the parking lot cars indicating a substantial crowd of people and in the restaurant a party of approximately 35 people, beginning to leave. Walters confronted Lawrence Sawyer as to how this party came about and Lawrence Sawyer stated that it occurred at the last minute. He refused, however, to account for the proceeds of the party. The party could not have been a sudden occurrence as the restaurant did not have sufficient supplies on hand to cater to a party that size and accommodate its regular dinner guests, without notice.

36. Lawrence Sawyer admitted to Walters that he kept and claimed the right to keep the proceeds from the large catered orders and dinner parties. According to the restaurant calendar, such parties occurred on the following occasions: April 9, 1990 and April 20, 1990, April 27, 1990, May 5, 1990, June 14, 1990, June 20, 1990, June 24, 1990, June 27, 1990, July 1, 1990, July 7, 1990, July 14, 1990, July 17, 1990, August 18, 1990 and August 26, 1990. (Plaintiff Ex. 8).

37. On August 17, 1990, Aurigema filed a business certificate at the Suffolk County Clerk's Office, certifying that she was conducting business under the designation "Southern Taste Restaurant". Asked to whose interest she had succeeded, she replied "None." (Defendant Ex. E).

38. During August 1990, the waitresses were instructed to give all receipts to Aurigema and not to put them in the register. One waitress observed Aurigema put the receipts in her pocket.

39. On August 31, 1990. Walters himself observed Aurigema, on two occasions, take receipts from customers and put the money in her pocket, not in the cash reg-

ister, and not ring up the sale. The following day Walters told Sawyer what he had seen and Sawyer, who probably had been waiting for this moment, told Walters that he was out, that the restaurant would be closing for two weeks and that when it reopened Walters would not be part of the operation. He told Walters that he had filed in bankruptcy under Chapter 11. What he did not tell Walters was that the creditors meeting had been held and closed just two days earlier, on August 29, 1990.

40. Other personnel at the restaurant were told that the restaurant would be closed temporarily and that they would then be recalled. When the restaurant reopened in September, Walters went back and tried to use his keys, but discovered that the locks had been changed and his alarm code was no longer in the system. When he confronted Sawyer with this fact, Sawyer again told him flatly that he was no longer part of the restaurant operation. Walters attempted to retrieve the books of account which he had maintained, but they were gone.

41. Except that Walters was no longer part of the business, everything continued as before when the restaurant reopened.

The same menu was in use, many of the same personnel were working. Sawyer continued to be in charge and probably to be the chef, although he denies it, and bills were paid exactly as though no change in ownership had taken place.

42. In the meantime, the bankruptcy proceeding was going forward in the routine way characteristic of a "no asset" case. On September 26, 1990, the Trustee reported that there were no assets to distribute.

43. But, Walters, alerted by Sawyer on August 31, 1990, that a bankruptcy proceeding had been filed, of which he had had no previous knowledge, investigated and through an attorney moved, on September 14, 1990, to extend the time to commence an adversary proceeding. Two months after this motion was made, on November 12, 1990, Angela Sawyer and Lawrence Sawyer belatedly moved to include Walters as a creditor on their schedules. The adversary proceeding was filed on February 14, 1991.

44. The books and records of the restaurant kept by Walters show revenues earned through the date of the bankruptcy filing, as follows:

| Date (1990) | Revenues | Number of Days Missing |
|---|---|---|
| 4/6–4/8 | $2,777.00 | 3 days |
| 4/9–4/15 | $4,494.00 | |
| 4/17–4/22 | $4,376.00 | |
| 4/24–4/29 | $3,994.00 | |
| 5/1–5/6 | $4,286.00 | |
| 5/8–5/13 | $4,795.00 | |
| 5/15–5/21 | $4,386.00 | |
| 5/22–5/27 | $5,935.00 | 1 day |
| 5/29–6/3 | $4,068.00 | 2 days |
| 6/5–5/10 | $5,719.00 | 1 day |

(Plaintiff Ex. 16).

45. Subsequent to the bankruptcy filing, the restaurant continued to earn revenues, exclusive of numerous missing entries, as follows:

| Date (1990) | Revenues | Number of Days Missing |
|---|---|---|
| 6/12–6/17 | $5,029.00 | 1 day |
| 6/19–6/24 | $6,851.00 | |

| Date (1990) | Revenues | Number of Days Missing |
|---|---|---|
| 6/26–7/1 | $4,858.00 | |
| 7/3–7/8 | $ 616.00 | 5 days |
| 7/10–7/15 | $4,426.00 | 1 day |
| 7/17–7/22 | $4,529.00 | |
| 7/24–7/29 | $2,427.00 | 3 days |
| 7/31–8/5 | $2,504.00 | 2 days |
| 8/7–8/12 | $2,840.00 | 2 days |
| 8/14–8/19 | $2,070.00 | 1 day |
| 8/21–8/26 | $4,534.00 | |
| 8/29–9/2 | $2,178.00 | 2 days |

(Plaintiff Ex. 16).

---

46. Lawrence Sawyer and Walters divided profits from the restaurant business on the following dates and in the following amounts:

| Date of Division | Amount Divided | Amount Taken By Lawrence Sawyer | Amount By Walters |
|---|---|---|---|
| April 7, 1990 | $690.00 | $414.00 | $276.00 |
| April 14, 1990 | $572.00 | $343.20 | $228.80 |
| April 21, 1990 | $846.00 | $508.00 | $338.00 |
| May 5, 1990 | $920.00 | $552.00 | $368.00 |
| May 19, 1990 | $744.00 | $446.40 | $297.60 |
| June 9, 1990 | $950.00 | $570.00 | $380.00 |
| July 15, 1990 | $952.00 | $571.80 | $381.20 |
| July 29, 1990 | $1170.00 | $702.00 | $468.00 |
| August 12, 1990 | $475.00 | $285.00 | $190.00 |
| August 26, 1990 | $1103.00 | $661.00 | $441.00 |
| TOTAL AMOUNT | $8422.00 | $5053.40 | $3368.60 |

(Plaintiff Ex. 17).

---

47. As of the date of the bankruptcy filing, June 13, 1990, the restaurant account showed a balance in the sum of $1,124.23.

48. During the months of restaurant's operation, prior to September, 1990, the restaurant account showed the following balances:

| Date | Balances |
|---|---|
| 4/10/90 | $2,963.17 |
| 5/9/90 | $3,293.18 |
| 6/11/90 | $2,902.55 |
| 7/11/90 | $2,732.26 |
| 8/13/90 | $ 816.03 |

(Plaintiff Ex. 5).

49. At the trial of the adversary proceeding, Walters proved to be a truthful witness, careful and straightforward in his answers. However, neither Lawrence Sawyer nor Angela Sawyer were believable witnesses. Sawyer's testimony at the trial repeatedly contradicted answers he had given at his deposition. For example, at the deposition, he had claimed that Aurigema paid him rent, at the trial he conceded that he received no money from her. Angela Sawyer was evasive and unresponsive and seemed unaware that she was participating in a judicial proceeding.

50. Critical documents, although repeatedly requested by the plaintiff, like the checkbooks maintained for the restaurant business, were not produced at the trial, justifying the inference that their evi-

dence would not be helpful to the defendants.

51. The Debtors' schedules are characterized by omissions, misstatements and flat misrepresentations. Lawrence Sawyer replied falsely when he denied that he had any interest in any partnership. The Debtors appear to have been prepared to withhold the truth and yet provide some flimsy basis for contending that it had been supplied. They were less than candid in swearing that Southern Taste, Inc. "has no equity in any assets."

52. No one reading these schedules would learn that at the time these Debtors filed they were the joint owners of a corporation, which in turn owned a building of a value of over $400,000, in which a profitable restaurant was flourishing and which was throwing off a rental income of $800 per month. According to the appraisal the Sawyers had furnished National Westminster Bank just a few months earlier, Southern Taste, Inc. had an equity of at least $25,000 in the Islip Avenue property and was receiving $800 a month in rent from the property.

53. The schedules were misleading in attributing the $800 Sawyer was receiving in rents from the property owned by Southern Taste, Inc. to income from the operation of Sawyer's business identified as being a restaurant owner and operator. That income should have been properly identified as income from real estate which would have led to a discovery of this potentially valuable asset.

54. Omitted from the Statement of Executory Contracts is the partnership agreement with Walters, the lease covering the Volvo car driven by Mrs. Sawyer, the lease which Lawrence Sawyer signed personally with Aurigema and the leases under which the tenants are occupying the rental apartments at the Islip Avenue property.

55. The schedules are false and misleading in the following respects:

(a) in omitting Walters from the list of Sawyer's creditors;

(b) in denying the existence of Sawyer's interest in the partnership with Walters;

(c) in denying possession of any executory contracts;

(d) in describing Southern Taste as lacking any equity in its property;

(e) in denying ownership of any shares of stock other than in Southern Taste, Inc., whereas Angela Sawyer owns at least 200 shares of NYNEX stock;

(f) in describing the rental received from the property owned by Southern Taste as income from the restaurant business;

(g) in describing the restaurant as owned by Southern Taste, Inc. whereas it was owned by the partnership consisting of Walters and Sawyer;

(h) failing to disclose that Southern Taste, Inc. owned a valuable piece of property, having an appraised value substantially in excess of the mortgages on it;

(i) in failing adequately to disclose the lease covering the Volvo driven by Mrs. Sawyer;

(j) in acknowledging the existence of a single bank account, although Sawyer was using four when he filed;

(k) in denying any transfer to other entities during the prior year.

56. As a result of Sawyer's actions, Walters has been deprived of his involvement in the partnership with Sawyer and the profits of that partnership.

57. One purpose behind the bankruptcy petition filed by Sawyer and his wife was to eliminate Walters as a partner of Sawyer.

## DISCUSSION

The "central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt'.... [However], the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Grogan v. Garner,*

—— U.S. ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Certain acts forfeit the right to a discharge and certain debts are not dischargeable.

This is not a borderline case. Lawrence Sawyer set out to defraud Walters and also to work a fraud on this Court. Judging by the Sawyers' petition and the facts that have been disclosed in this adversary proceeding, neither Sawyer nor his wife was ever in need of the protection the bankruptcy laws give a debtor needing a fresh start. This proceeding was filed as part of a fraudulent scheme; it was not filed in good faith.

However heavy the burden of proof lying on a creditor opposing a debtor's discharge or the dischargeability of the debt owed him, it has been more than met here.

### Discharge

■ The Sawyers are barred from discharge by both 11 U.S.C. § 727(a)(4) and § 727(a)(2). Pursuant to Section 727(a)(4) "[t]he court shall grant the debtor a discharge unless— ... (4) the debtor knowingly and fraudulently, in or in connection with the case— ... (a) made a false oath or account...." Lawrence Sawyer and his wife have filed schedules which are false, which misrepresent and omit significant information.

The Debtors' petition and schedules cover 14 pages and there is almost no page on which one or more misstatements, either by commission or omission, is not present. They all have the same purpose: to conceal from the Chapter 7 Trustee their valuable assets, to hide Sawyer's ownership of a prosperous restaurant and their interest in a valuable income producing property. Sawyer concealed the restaurant partnership by omitting Walters from the list of unsecured creditors, by denying he owned any equipment, supplies or inventory, by denying any interest in a partnership, and by falsely attributing the $800 a month income he was receiving from the tenants at the Islip Avenue Premises to his restaurant business.

He protected these falsehoods by denying that any books of record or account had been kept in the two years preceding the filing of the petition, although even as he was preparing the petition he was sitting down each week with Walters reviewing the records that Walters was scrupulously keeping.

Furthermore, when Lawrence Sawyer denied that he was engaged in a partnership with anyone, even as he was daily dividing with Walters the receipts from their partnership, he made a false oath and account. He did so knowingly and the inference is inescapable that he did so fraudulently. When he and his wife denied owning any stock (other than their shares in Southern Taste, Inc.), although for years she had been accumulating shares in NYNEX and only a few months earlier had listed this stock as proof that they were eligible for an SBA loan, they made a false oath.

But the omissions from their schedules did not stop there. Their answers were calculated to conceal their ownership, through Southern Taste, Inc., of income producing property with a total value which they had reason to believe exceeded the mortgages on it by $25,000. The income from the real estate was concealed by attributing it to the operation of a business or profession. By so doing, Sawyer was able to conceal that he had two sources of income, both rents from the property owned by Southern Taste and profits from the restaurant business.

Further, consistent with the concealment of the real property and the restaurant business, is the assertion that the Debtor had no executory contracts, although Sawyer had personally leased the restaurant premises to Aurigema, that the debtor had an ongoing partnership agreement with Walters, and that the three tenants on the Islip Avenue Premises no doubt held leases.

■ Sawyer's explanation that the omissions and falsehoods were due to the fact that he regarded the petition as concerning only his personal assets, not his business ventures, will not wash. That explanation is inconsistent with the fact that the Debt-

ors listed among their debts the personal guaranty of the SBA loan and the amount owed the appraiser for appraising the business premises. Second, that explanation will not account for the denial of any partnership interest since the partnership was personal between Sawyer and Walters. Third, that explanation does not account for the false attribution of the rental income to the restaurant business.

■ To prevail under Section 727(a)(4)(A) the objecting creditor must show that the false statement was made with respect to a material matter, that is one bearing a relationship to the debtor's business transactions or estate or which would lead to the discovery of assets, business dealings or existence or disposition of property. *In re Montgomery*, 86 B.R. 948, 956 (Bankr. N.D.Ind.1988); *In re Sapru*, 123 B.R. 948, 957 (Bankr.E.D.N.Y.1990); *see In re Mascolo*, 505 F.2d 274, 277 (1st Cir.1974); *In re Kessler*, 51 B.R. 895, 899 (Bankr.D.Kan. 1985).

The failure to disclose the partnership with Walters, the omissions that concealed the successful restaurant business that Sawyer was operating and the misleading description of the value of the stock in Southern Taste, Inc. all betray a fraudulent intent. Sawyer obviously did not want the Trustee to learn of the restaurant business and he did not want Walters to learn of the bankruptcy proceeding. He succeeded in both respects. His omission of Walters' name from the list of creditors was calculated to assure that Walters would not learn of the bankruptcy proceeding until it was almost too late to act and the denial of any partnership interest assured that the Trustee would take no interest in the restaurant business.

■ The Court does not credit Mrs. Sawyer's explanation of the omission of the stock from the schedules as due to the fact that she never thinks of it as available because it is intended as a retirement fund. Equally unworthy of belief, is her claim that she also knows nothing about her husband's partnership with Walters, nor the assets of the corporation of which she is a

49 percent stockholder. Mrs. Sawyer impressed the Court as an intelligent woman; she is a high school graduate and has been employed by the New York Telephone Company for the last 16 years where she now holds the position of "Business Network Consultant." When acknowledging the stock as an asset was to the advantage of the Debtors, as when Southern Taste, Inc. was applying for a loan, she recalled its existence. The stock is paid for by regular deductions from her paycheck. That she did not want to jeopardize the stock is believable. It may also be that she thought it was exempt property. But neither belief entitled her to omit the stock in answering questions clearly calling for its disclosure.

■ Nor does the Court credit Mrs. Sawyer's disclaimer of any knowledge that Southern Taste, Inc. is not a valueless shell. She signed the financial statement that secured the loan that made it possible for the corporation to buy the building in which the restaurant was established. How could she not have learned at some point who owned the building?

Omissions, misrepresentations and lies on such a scale as in the Debtors' schedules, all so obviously intended to prevent discovery of major assets, necessarily forfeit any right to discharge. The omissions were clearly material; there is no explanation for them except that they were intended and had as their purpose, a purpose which they nearly accomplished, to conceal the possession of major assets from the Chapter 7 Trustee and the Debtors' creditors.

■ Walters opposes the Sawyers' discharge under Section 727(a)(2), as well as Section 727(a)(4). Section 727(a)(2) authorizes the court to deny the debtor a discharge if:

[W]ith intent to hinder, delay, or defraud a creditor ..., [the debtor] has transferred, removed, destroyed, mutilated, or concealed or has permitted to be transferred, removed, destroyed, mutilated or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

The false oath made by both Lawrence Sawyer and Angela Sawyer also constitutes concealment, forfeiting a discharge under Section 727(a)(2). "[A] debtor's failure to list valuable property on the schedule of assets and failure to disclose prepetition property transfers constituted fraudulent concealment." 4 Colliers on Bankruptcy ¶ 727.02 at 727–30—727–31 (15th ed. 1990); *In re Ingle*, 70 B.R. 979 (Bankr. E.D.N.C.1987) (Finding debtor's failure to list sixteen foot boat on schedule of assets a concealment of property pursuant to § 727(a)(2)).

Lawrence Sawyer, in addition to concealing assets by filing false schedules, also, concealed assets by transferring them to Aurigema.

■■■ Section 727(a)(2) requires that there be *"intent* to hinder, delay or defraud a creditor" (emphasis added). The requisite intent required is actual, not constructive intent. 4 Colliers on Bankruptcy, ¶ 727.02 at 727–15 (15th ed. 1990); *In re Bernard*, 99 B.R. 563 (Bankr. S.D.N.Y.1989). However, actual intent may be inferred. There is rarely direct proof of fraudulent intent, the Court must look to "badges of fraud." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983).

Persons whose intention it is to shield their assets from creditor attack while contriving to derive the equitable benefit of those assets rarely announce their purpose. Instead if their intention is to be known, it must be gleaned from the inferences drawn from a course of conduct, (citations omitted), taking into account the timing of the events or transfers in question, (citations omitted), and the ultimate purpose of such conduct. (citations omitted).

*In re Berman*, 100 B.R. 640, 647 (Bankr. E.D.N.Y.1989).

Before filing his petition and after he was already contemplating filing, Sawyer signed a long term lease with Aurigema on which she has paid nothing. After he filed, he facilitated her receipt of a liquor license for the restaurant business. Again, without consideration. No useful purpose would be served by attempting to allocate the goodwill of the restaurant business, or the value of its premises, or of its liquor license, among Sawyer's various legal persona consisting of himself, his corporation (which he viewed as himself) and his partnership. In one form or another, whoever had the right to them, they were ultimately available to creditors of Sawyer had he not transferred them to Aurigema. There was no business purpose in entering into a lease with Aurigema who apparently was never expected to, and never did, pay any rent. There was, likewise, no business purpose in having the liquor license taken out in her name. The excuse given, that Walters might have had difficulty in getting a liquor license, was not shown to have any substance. These were all transfers within the reach of Section 727(a)(2).

After the petition was filed, Sawyer withheld knowledge of the partnership and of the restaurant profits from his Chapter 7 Trustee and continued to enjoy them, although his share of the business had become part of the estate. He also sanctioned Aurigema's appropriations of the business receipts, by putting them in her pocket which effectively removed them from the estate.

After the petition was filed, he continued assisting Aurigema in obtaining the assets represented by the restaurant business, of which his 60 percent share constituted property of the estate, although the Trustee was unaware of that fact. Thus, he let Aurigema file a certificate that she was doing business under the name associated with the goodwill of the restaurant, Southern Taste. He permitted her to take possession of the restaurant after September 1, 1990, and to operate it as her own business.

The surrounding facts compel the inference that whatever he did was intended to hinder, delay and defraud his creditors and to conceal from the Trustee in Bankruptcy

his interest in the restaurant business. That he was successful is shown by the fact that the Trustee has filed a no asset report.

The Sawyers have clearly forfeited their right to a discharge under both 11 U.S.C. § 727(a)(2) and § 727(a)(4). Congress has not "favored the interest in giving perpetrators of fraud a fresh start over the interest of protecting victims of fraud." *Grogan v. Garner, supra*, 111 S.Ct. at 659.

### Dischargeability

Turning now to 11 U.S.C. § 523(a)(2), (4) and (6). § 523(a)(2) excepts from discharge money obtained by false pretenses, a false representation, or actual fraud. Subsection (a)(4) excepts debts due to fraud while acting in a fiduciary capacity. Subsection (a)(6) excepts willful and malicious injury by the debtor to another entity or to the property of another entity.

Because it is so clear that fraud is present here, barring dischargeability under Section 523(a)(2) and (a)(4), no purpose would be served by considering Section 523(a)(6) into which the facts present here would fit only with the utmost difficulty.

■ Fraud includes any "deceit, artifice, trick or design ... used to cheat another—something said or done omitted with the design of perpetrating a cheat or deception." *In re Kostoglou*, 73 B.R. 596, 599 (Bankr.N.D.Ohio 1987), *quoted by* Chief Judge Platt in *In re Coffee Cupboard, Inc.*, 119 B.R. 14, 18 (E.D.N.Y.1990). Exactly when Sawyer conceived the design to cheat Walters out of his 40 percent interest in the restaurant they had planned to run together is unknown, but no sooner was the restaurant opened than he began to carry out his scheme. While Walters, unknowingly, kept the books religiously and divided the profits each night, Sawyer filed a petition which automatically dissolved the partnership. N.Y. Partnership Law, § 62(5) (McKinney 1988); *King v. Leighton*, 100 N.Y. 386, 3 N.E. 594 (Ct. of App.1885); *Matter of Minton Group, Inc.*, 46 B.R. 222, 224 (S.D.N.Y.1985) (finding that N.Y. Partnership Section § 62 dictates

that upon the filing of bankruptcy of one partner, the partnership is dissolved). He then surreptitiously transferred to Aurigema the property needed for the operation of the restaurant business for which the partnership had been created. There was here both bad faith and intentional wrongdoing, two traditional hallmarks of fraud.

■ Aggravating the wrong done by Sawyer is the fact that under the law of the New York a partnership relationship is a fiduciary relationship. N.Y. Partnership Law, § 43 (McKinney 1988); *In re Stone*, 90 B.R. 71 (Bankr.S.D.N.Y.1988), *aff'd* 94 B.R. 298 (S.D.N.Y.1988), *aff'd* 880 F.2d 1318 (2d Cir.1989).

> Beyond the express language of Section 43 of the Partnership Law, New York partners are *at all times* accountable to one another as trustees. In the timeless words of then Chief Justice Cardozo, a partner is "[a] trustee [who] is held to something stricter than the morals of the marketplace. Not honesty alone, but punctilio of an honor the most sensitive is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928). *Accord, Auld v. Estridge*, 86 Misc.2d 895, 382 N.Y.S.2d 897, 898, 902 (Sup.Ct.1976).

*In re Stone, supra*, 94 B.R. at 303.

■ Not all courts are in agreement as to the significance of state law in applying Section 523(a)(4). Recognizing that Federal law governs whether one is a fiduciary for the purpose of Section 523(a)(4), one court has held that regardless of state law, partners are not fiduciaries for the purposes of Section 523(a)(4). *In re Reeves*, 124 B.R. 5 (Bankr.D.N.H.1990). But other courts in agreement with *In re Stone*, acknowledging that the issue of who is a fiduciary for purposes of Section 523(a)(4) is a question of Federal law, nevertheless consult state law as to whether a fiduciary relationship exists. *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986); *In re Stewart*, 123 B.R. 817, 820 (Bankr. W.D.Tenn.1991); *In re Woosley*, 117 B.R. 524, 529 (9th Cir.BAP 1990); *In re Short*, 818 F.2d 693, 695 (9th Cir.1986); *In re Bangerter*, 106 B.R. 649, 654 (Bankr.

C.D.Cal.1989). In this Circuit, that a partner is a fiduciary in New York for the purposes of Section 523(a)(4) is now settled law. *In re Stone, supra.*

 There remains to be decided the size of the debt of Lawrence Sawyer to Hubert Walters. Under New York law, when Sawyer filed under Chapter 7 he automatically dissolved the partnership. N.Y. Partnership Law, § 62(5) (McKinney 1988). Because the dissolution was wrongful, Walters has the right to damages for breach of the agreement. N.Y. Partnership Law, § 69(2)(a)(II) (McKinney 1988); *Berkule v. Feldman,* 39 Misc.2d 250, 240 N.Y.S.2d 462, 466 (Sup.Ct.1963); *Napoli v. Domnitch,* 18 A.D.2d 707, 236 N.Y.S.2d 549, 552 (1962). Walters' damages consist of the amount he gave Sawyer for the partnership that never really came into being, plus the profits he would have made had the partnership continued.

In *Wakeman v. Wheeler & Wilson Manufacturing Co.,* 101 N.Y. 205, 4 N.E. 264 (1886), the New York Court of Appeals said that the damages, due to a wrongful dissolution of partnership, are "the profits which would have accrued to the plaintiff from the continuation of the partnership business, and which are lost by the unauthorized dissolution; and that evidence of the actual gains of the partnership during its continuance is admissible as an element in determining the value of the prospective profits." *Id.* at 210–211, 4 N.E. 264. (citing *Bagley v. Smith,* 10 N.Y. 489 (1853).

Arguably, Walters is entitled not only to compensatory damages but punitive damages. The Court of Appeals for this Circuit has affirmed the award of punitive damages where a partner has defrauded another, finding that consistent with New York law. *Whitney v. Citibank, N.A.,* 782 F.2d 1106 (2d Cir.1986). Affirming the District Court's award of $1.5 million punitive damages, the Court said:

"Under New York law, by which we are governed in this diversity suit, punitive or exemplary damages may be awarded where the defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer." *Walker v. Sheldon,* 10 N.Y.2d 401, 404–05, 223 N.Y.S.2d 488, 490–91, 179 N.E.2d 497, 499–500 (1961)

*Whitney,* at 1118.

Therefore, Walters is entitled, at the minimum, to recover his $20,000 he paid Sawyer plus the profits of which he was deprived by Sawyer's wrongdoing. The record furnishes some evidence, albeit incomplete, of the profits the partnership made during the short period before Sawyer totally ousted Walters at the end of August. The profits are incomplete because they do not include the money that Sawyer was making on the catering functions that should have been included in the partnership, they probably do not reflect the amount made on jazz nights and do not include what Aurigema put in her pocket. Therefore, they understate the profits Walters would have earned. However, they will serve as a basis.

Where it is certain that damages have been caused by a breach of contract and the only question is as to their amount, there can rarely be a good reason for refusing to grant, on that account, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of damages which he has caused is uncertain.

*Borne Chemical Company, Inc. v. Dictrow,* 85 A.D.2d 646, 445 N.Y.S.2d 406, 413–414 (1981) (citing *Wakeman v. Wheeler & Wilson Manufacturing Co.,* 101 N.Y. 205, 4 N.E. 264 (1886); *Randall–Smith, Inc. v. 43rd St. Estates Corp.,* 17 N.Y.2d 99, 268 N.Y.S.2d 306, 312, 215 N.E.2d 494, 498 (1966)).

 From the period beginning April 7, 1990, and continuing through August 26, 1990, Sawyer and Walters divided profits of $8,422.00. This constituted the first five months of operation. This amounts to an average of $1,684.40 per month. For the

remaining seven months of the year, assuming that figure remained constant, the profit would have been $11,790.80. Since Walters was entitled to forty percent of the profit, he would have received $4,716.32. Using this same figure of $1,684.40 per month for the balance of the three year partnership term, would yield total profits of $40,425.60 of which 40 percent is $16,170.24. Thus, the total profits lost are $4,716.32 which would have been earned during the last seven months of the first year, and $16,170.24 which would have been earned in the remaining two years, giving a total of $20,886.56 in lost profits.

■■■ Walters is entitled to interest at the legal rate on the damages from the date that Sawyer improperly dissolved the partnership which is the date on which he filed under Chapter 7, June 11, 1990. *DeIulio v. 320–57 Corp.*, 99 A.D.2d 253, 472 N.Y.S.2d 379, 381 (1984) (finding that CPLR § 5001(a) now mandates that interest is recoverable on monetary damages awarded for breach of contract); N.Y.Civ. Prac.L. & R. 5001 (Consol.1963).

■■■ The Court considers that Sawyer's conduct involved such gross, wanton, willful fraud and dishonesty as to be morally culpable and to call for punishment. The Court finds particularly outrageous the deceit involved in Sawyer going through the farce of reviewing Walters' records and dividing the profits with him each night, even as he was filing for bankruptcy, drawing up a lease to Aurigema and conspiring with her to oust Walters. However, the Court is not awarding such damages because they were not requested by Walters and the issue of their availability was not tried. However, the fact that they would be appropriate in this case reinforces Walters' right to the damages being awarded him for the loss of his investment and his profits due to Sawyer's wrongdoing.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and § 157(b)(2)(J).

■■■ 2. The complaint fails to state a claim against Marjorie Aurigema, although she has defaulted in this proceeding. She is not a debtor asking for a discharge of her debts and, therefore, 11 U.S.C. § 523 and 11 U.S.C. § 727 do not apply to her. The complaint against her is dismissed.

3. Lawrence Sawyer acted in a deliberate and calculated manner to exclude Walters from the restaurant business and to appropriate the $20,000 invested by Walters and the profits of the restaurant.

4. Lawrence Sawyer obtained money and services from Walters through actual fraud.

5. Lawrence Sawyer intentionally transferred, removed and concealed property of the Debtors within one year before filing the bankruptcy petition and property of the estate after the filing of the petition, with the intent to hinder, delay or defraud Walters and his other creditors.

6. Lawrence Sawyer and Angela Sawyer, knowingly and fraudulently in connection with this case, filed a false, misleading and incomplete bankruptcy petition and schedules forfeiting their discharge under 11 U.S.C. § 727(a)(2) and § 727(a)(4).

7. Lawrence Sawyer's debt to Hubert Walters is excepted from discharge under 11 U.S.C. § 523(a)(2) and § 523(a)(4) as based on both "actual fraud" and "fraud ... while acting in a fiduciary capacity".

8. Walters is entitled to damages for lost profits amounting to $20,886.56, plus interest from June 13, 1990.

Settle Order.