**In re Robert A. SCHELLER, Anita I. Scheller, a/k/a Anita I. Puehl, Debtors.**

**Peter Adamo and Race Place of Danbury, Inc., Plaintiffs,**

v.

**Robert A. Scheller, Defendant.**

**Race Place of Danbury, Inc., Plaintiff,**

v.

**Anita I. Scheller, a/k/a Anita I. Puehl, Defendant.**

**Bankruptcy No. 00 B 12721(ASH).**
**Adversary Nos. 00–5042A, 00–5043A.**

United States Bankruptcy Court, S.D. New York.

July 25, 2001.

Sienkiewicz & McKenna, P.C., by Jeffrey B. Sienkiewicz, New Milford, CT, for plaintiffs.

Greenspan & Greenspan, by Leon J. Greenspan, White Plains, NY, for debtors and defendants.

### DECISION AFTER TRIAL ON DISCHARGEABILITY OF JUDGMENT DEBTS

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Plaintiff Peter Adamo ("Peter"), suing individually and for the benefit of co-plain-

tiff Race Place of Danbury, Inc. ("Race Place"), seeks determinations of non-dischargeability under 11 U.S.C. § 523(a)(4) and (6) in respect of a state court judgment held by Peter against debtor-defendant Robert A. Scheller ("Robert") and a state court judgment held by Race Place against Robert's wife, debtor-defendant Anita I. Scheller a/k/a Anita I. Puehl ("Anita").

### Jurisdiction

The Court has jurisdiction over these adversary proceedings under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference in this District dated July 10, 1984 (Acting Chief Judge Ward). These are core proceedings under 28 U.S.C. § 157(b)(2).

### Findings and Conclusions

The following constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### Background

### The slot car business

For those unfamiliar with the slot car business, a brief description (albeit technically inadequate and perhaps even inaccurate) will be helpful.

Slot cars are hand-held, remote-controlled, NASCAR-styled racing cars on a scale of 1:24 with auto bodies, tires, etc., powered by electric motors. They are designed for operation on special electronic racetracks from 80 to 200 feet long. Operators of slot car racing amusement centers typically run multiple electronic tracks in order to accommodate a large clientele. Ancillary services at slot car establishments typically include a hobby center (for assisting customers to build and repair their own slot cars), spare parts, repair services, display cases and inventory for merchandising new slot cars and related

paraphernalia and various types of electronic video games, pinball machines, food and soft drink vending machines and the like to service the entertainment needs of young and not-so-young slot car afficionados. To serve their customers slot car tracks may be open for business from early afternoon until 11:00 P.M. or later during school days and from late morning or noon until midnight on weekends. A slot car business requires an investment of $50,000 to $100,000 or perhaps more for tracks, merchandise inventory, video game machines, etc. It is almost entirely a cash business on the receipts side, and a significant portion of expenses may be payable in cash.

It appears that Robert was a long-time afficionado of slot car racing. Prior to meeting Peter, Robert had been involved in the slot car business and had extensive experience in the technical aspects of constructing slot car tracks, servicing and repairing slot cars and running a slot car business.

Peter, who worked in management, sales and estimation in the construction business, had no experience with slot cars or the slot car business. But he owned a building in Danbury, Connecticut in which a tenant had unsuccessfully attempted to operate a slot car business.

Having some acquaintance with Peter's unsuccessful slot car tenant, Robert approached Peter in the summer of 1994 with a proposal for Robert and Peter to engage in a joint venture to operate a slot car business in the space in Peter's building which had been occupied by the unsuccessful slot car tenant. After some discussions, Peter and Robert reached an agreement. Fortunately, the precise terms of this agreement for a slot car joint venture are not germane to the outcome of these adversary proceedings.

The agreement was never reduced to writing and the terms of the agreement were fuzzy at best and were the subject of some differences in testimony at the trial. It will suffice for purposes of this decision to describe the parties' understanding as follows. Robert, who was unschooled in matters relating to business organization, described their enterprise as a "joint venture" or "partnership" in which each party would take equal equity shares. The business would be called "Race Place of Danbury." Peter, who had financial resources, a full-time job in the construction industry, owned the building and had no knowledge of the slot car business, would provide the financing necessary to capitalize and operate the business as well as the premises in his building, which would be rented by Race Place pursuant to an oral lease at an agreed-upon rental. Peter would obtain all the necessary municipal approvals and oversee and pay for the necessary modifications for the premises, including handicap-accessible bathrooms and the like. Robert, having no money but lots of experience in the slot car business, would be responsible for the technical aspects of constructing the race tracks, acquiring the merchandise and fixtures and operating the business. Robert and Peter would each own 50% of the business, Peter's contribution being financing and Robert's contribution being "sweat equity." The foregoing does not reflect Peter's understanding of his joint enterprise with Robert, since Peter expected Robert to make a financial contribution to the business, in addition to "sweat equity." Peter clearly understood that the joint venture was to be conducted in the corporate form, and in September 1994 he engaged his personal counsel, Sienkiewicz & McKenna, P.C., to do the necessary legal tasks to incorporate Race Place of Danbury, Inc. Peter and Robert were each to own 50% of the stock of Race Place, and

both were to be officers and directors of the corporation. However, it appears that the corporate formalities were never observed; there were no formal meetings of shareholders or directors, no formal election or selection of officers and directors and no shares of stock were actually issued. It appears that the corporate kit came into and remained in the possession of Anita.

Despite the lack of a formal agreement or corporate formalities, the parties performed in accordance with their varying understandings. Race track equipment, display cases, inventories of merchandise for sale and race cars for nightly hire were acquired, assembled, installed and readied for business, with Robert doing the work and Peter paying the bills. The business opened on December 18, 1994 and, it appears, soon attracted an enthusiastic clientele. Robert operated the business, basically seven days a week during most of the long hours of operation described above. Peter made it a practice to visit the premises and observe the business daily or less frequently as time went on, generally for a short while at the end of his normal working day.

Unable to cope with both the operational aspects of the slot car business (running the tracks, selling merchandise, operating the repair services, servicing the video games, etc.) and also attend to the financial end of the business (receiving and accounting for the cash, paying the bills, etc.), Robert recruited Anita to be fully responsible for the financial end of the business, with Peter's knowledge and approval. Thus, Peter and Anita, but not Robert, had signature authority for the Race Place bank account. Peter gave Anita detailed instructions concerning her duties as a bookkeeper, covering such matters as handling the money, paying the bills and keeping meticulous records of all

cash receipts and disbursements and invoices for all bills paid. Anita also devoted long hours to her work at Race Place. Neither of the Schellers drew any salary or wages from Race Place.

### Peter's growing distrust of the Schellers

Although the slot car business at the Race Place soon became busy and (according to Robert) profitable, Peter became increasingly concerned with the Schellers' stewardship of the business. The reasons for this concern, as described by Peter at the trial, may be briefly summarized.

Although Peter had repeatedly instructed Anita as to the need for maintenance of complete and accurate records of cash receipts and all expenditures, Anita would not or could not provide him with the written records evidencing receipts and expenditures. Anita kept the books and records, including bank accounts, at the Scheller's home, rather than at the Race Place office at the business premises. Despite Peter's persistent requests for the business records, Anita persisted in stalling and never produced the records. When Peter finally obtained bank statements from the bank, the statements showed a large discrepancy between the cash deposited in the bank and the cash receipts reported or represented by the Schellers. Confronted with this discrepancy, the Schellers told Peter that substantial expenditures had to be paid in cash, but they did not produce invoices or other documentation for the expenditures. The Schellers had presented Peter with a handwritten list of capital, or start-up, expenditures allegedly incurred by Robert totaling $19,435 (whether for reimbursement or as Robert's capital contribution was not made clear). Peter repeatedly requested invoices, receipts or other documentation for these expenditures, but no such documentation was ever provided. Another source of concern related to the

payment of state sales taxes. Robert and Anita had assured Peter that they were paying state sales taxes as they were accrued. However, in March 1995 Peter received a criminal investigation summons revealing that sales taxes had not been paid, and he ultimately was required to pay the taxes with his own personal funds. Unbeknownst to Peter, the Schellers arranged for the Race Place mail to be diverted to a Post Office box in Chappaqua used and controlled by the Schellers and Anita's mother, which was discovered by Peter in early April. Finally, the Schellers had assured Peter that liability insurance for Race Place had been paid. Peter ultimately learned that these representations were false, and he had to pay the insurance premiums for Race Place with his personal funds.

At the trial Robert and Anita presented testimony for the purpose of rebutting or explaining most if not all of the concerns adumbrated in Peter's testimony. It is unnecessary for the Court to reach any conclusions or make any findings with respect to the various elements giving rise to Peter's concerns. All issues between the parties were litigated and resolved in the two Connecticut lawsuits, and these adversary proceedings are concerned only with dischargeability of the two money judgments. Suffice it here to state that, rightly or wrongly, Peter was in fact concerned with the Schellers' stewardship of Race Place, and these concerns prompted his actions described immediately below.

### The Adamo Action

Faced with what he believed was serious misconduct by the Schellers in their operation of Race Place, Peter consulted his counsel, Sienkiewicz & McKenna, PC., who prepared a summons and complaint in the Connecticut Superior Court in an action entitled *Peter Adamo v. Race Place of Danbury, Inc. and Robert Scheller* ("the

*Adamo* Action"). The complaint, dated April 11, 1995, alleged four Counts. The First Count alleged in material part:

3. There has been fraud, collusion and/or gross mismanagement in the conduct or control of the corporation by the defendant, Robert Scheller, an officer and director of the corporation.

4. It is necessary to wind up the corporation for the protection of the rights or interests of the shareholders.

The Second Count alleged, in material part:

3. Although the plaintiff has demanded an accounting of the income from the defendant, Robert Scheller, the defendant has neglected or failed to account to the plaintiff for such income.

The Third Count alleged, in material part:

3. In his capacity as an officer and director of the defendant corporation, the defendant, Robert Scheller, provided to the plaintiff statements of income and expense for the operation of the business over a period of months.

4. The representations contained in the statements were false and the defendant, Robert Scheller, knew or should have known them to be false and they were made by the defendant, Robert Scheller, to induce the plaintiff not to take action to discover the true state of affairs of the business of the Race Place of Danbury, Inc.

5. The plaintiff relied on the false representations of the defendant, Robert Scheller, to his detriment.

The Fourth Count alleged, in material part:

4. The defendant, Robert Scheller, has taken possession of cash assets of the defendant corporation with the intent to exercise dominion over that property.

5. Although the plaintiff is now entitled to and has demanded the property be returned, the defendant, Robert Scheller, has neglected to return it and has converted it to his own use.

In the WHEREFORE clause of the complaint, plaintiff sought appointment of a receiver and a decree dissolving the corporation in the First Count; an accounting and judgment for the amount due thereon in the Second Count; compensatory damages, punitive damages and costs of suit in the Third Count; and damages, interest and costs of suit in the Fourth Count. It is evident from the complaint that Race Place, as a corporate entity, was named as a nominal defendant only, and that the various causes of action were asserted against Robert.

### The April 11 lock-out and disappearance of Race Place property

Early in the morning of April 11, 1995, Peter arranged for the locks and the alarm system code for the Race Place premises to be changed to preclude the Schellers from entering the premises. It was Peter's intention to confront the Schellers when they arrived later in the day to open up the business and, with the assistance of the Sheriff, to serve Robert with the summons and complaint. After securing the premises against entry by the Schellers (so he thought), Peter situated himself in a neighboring storefront from whence he could observe the Race Place premises without himself being observed.

Some time after the premises were secured in the manner above described but before the Sheriff arrived, Robert arrived at the premises. At the trial Peter gave the following account of what then transpired, corroborated in substantial part by the testimony (by deposition transcript) of Gregory Pieck, a young slot car afficionado who was a patron and sometime, part-time employee of the Race Place. Despite the

change in locks and alarm codes, Robert was able to break into the Race Place premises by jimmying the lock. He was also able to disable the alarm so as to terminate its clanger, but the police were summoned and appeared on the scene anyway. Robert was able to persuade the police that he was the operator of Race Place and they departed. Robert was soon joined at the premises by his wife, Anita, and her mother, Irene. Assisted by one or two other persons (including Pieck), Robert, Anita and Irene proceeded to pack up virtually all of the merchandise, race cars and other inventory of the business (the "Missing Inventory") in bags, haul the bags out to the Scheller's pick-up truck, van and another, smaller car and drive off with the Missing Inventory as well as any books and records of the business which might have remained in the premises. Peter did not attempt to interfere with the Schellers' removal of the Missing Inventory.

Eventually, the Sheriff arrived on the scene. Peter confronted Robert, and the Sheriff served Robert with the summons and complaint. When Peter entered the Race Place premises he discovered that virtually all of the movable property had been removed, as he had already observed. Peter testified that the Race Place premises were fully stocked and ready to open for business, and that all of the Missing Inventory had been present at the premises, early in the morning of April 11 when he had the lock and alarm code changed. This was confirmed by Pieck, who testified that Race Place was fully stocked with inventory of all kinds on April 10.

Robert and Anita offered a quite different version of the events at the Race Place on April 11. Suffice it at this point to say that the Schellers denied that Gregory Pieck was present at the events on April 11 and they denied moving the Missing Inventory from the Race Place premises.

Not disputed are the facts relating to the $2,050 check. According to Robert, after he was served by the Sheriff with the summons and complaint, Robert realized that he was going to have to hire a lawyer to defend the *Adamo* Action. For this purpose, Robert and Anita decided to use whatever funds were available in the Race Place bank account, at that time $2,050. Accordingly, Robert instructed Anita to draw a check for $2,050 on the Race Place checking account made payable to Irene, and he instructed Irene to take the check immediately to the bank and cash it and deliver the cash to him. Irene proceeded to do all this on April 11. Robert testified that he paid the $2,050 cash as a retainer to an attorney by the name of Gerald Hecht, whom he hired to represent himself and Race Place in the *Adamo* Action.

### The Race Place Action against Anita and Irene

Peter subsequently retained Sienkiewicz & McKenna, P.C. to commence another action in the Connecticut Superior Court on behalf of Race Place as plaintiff against Anita, Anita's mother Irene and Anita's brother George Hennessy a/k/a George Hemingway. All claims against George Hemingway were eventually abandoned. The complaint, dated August 25, 1995, contained a First Count for "civil conspiracy" and a Second Count for "unfair trade practices." It appears that Irene operated a business entitled "Grand Amusement." The First Count alleged in paragraph 4 that "the defendants conspired with Robert Scheller to divert cash receipts, inventory and equipment of the Race Place of Danbury, Inc. to the defendants' own use" commencing in December 1994. In furtherance of the conspiracy, it is alleged that from December 1994 defendants committed a number of overt acts including

conversion of cash from the daily receipts of the operation of Race Place, the use of Race Place checks to purchase furniture, inventory and equipment for the benefit of Irene's Grand Amusement, and the like. The Second Count alleged the same conduct as a violation of the Connecticut Unfair Trade Practices Act.

### The Connecticut judgments

#### The judgment in the Adamo Action

Robert appeared by attorney Gerald Hecht in the *Adamo* Action and defended. In accordance with Connecticut procedures, two auditors were appointed by the Court to examine the allegations of misconduct by Robert and report on the financial affairs of the nominal defendant Race Place. After contested proceedings, the auditors rendered a Report dated August 26, 1996 and a Corrected Report dated October 10, 1996 (collectively, the "Reports"). The Reports were adopted by the Connecticut Superior Court and resulted in a judgment dated December 19, 1997 in favor of Peter against Robert for money damages, and other relief not germane here. Aside from costs, only two elements of the Reports and the judgment are relevant in this adversary proceeding, which seeks to declare non-dischargeable Peter's money judgment against Robert.

*Missing Inventory.* Paragraph 2 of the August 26 Report and the entirety of the October 10 Corrected Report dealt with the subject of Missing Inventory. Since it was undisputed at the trial in this adversary proceeding that there was a full panoply of merchandise, race cars and other inventory on hand at the Race Place premises at the close of business on the night of April 10, 1995, the "missing inventory" referred to in the Reports can only refer to the "Missing Inventory" referred to above in this decision in the section concerning the events of April 11. The auditors found

that the value of the Missing Inventory was $20,630 and concluded:

The auditors, therefore, correct Paragraph 2 of their report of August 26, 1996, by finding that Scheller should pay to Race Place of Danbury $20,630.00 for missing inventory.

*The $2,050 check.* In paragraph 1 of their August 26 Report, the auditors concluded as follows concerning the April 11 $2,050 check

... it is expressly found that Scheller improperly diverted $2,050.00 of funds from Race Place to his mother-in-law, Irene Puehl, and should be ordered to pay the $2,050.00 to Race Place of Danbury, Inc.

The December 19, 1997 money judgment in favor of Peter (on his own behalf and for the benefit of Race Place) against Robert comprised the following elements:

| Amount | Explanation |
|---|---|
| $ 2,050.00 | This is the amount of the April 11 check which Robert instructed Anita to draw on the Race Place checking account in favor of Irene. |
| $20,630.00 | This is the amount of the Missing Inventory as determined in the auditors' Corrected Report. |
| $ 7,800.00 | This represents the fees and expenses of the auditors. The Superior Court ordered Peter to pay this amount to the auditors and awarded Peter judgment against Robert for this amount. |
| $ 659.00 | Statutory costs |
| $26,160.52 | This represented Peter's costs in the *Adamo* Action, awarded as part of the judgment. The figure includes $22,640.52 for attorneys' fees and |

out-of-pocket expenses and $3,520 in accounting expenses.

| | |
|---|---|
| $57,299.52 | Total |

### The judgment in the Race Place Action

On January 29, 1999 the Connecticut Superior Court rendered its judgment in favor of Race Place against Irene and Anita. The judgment comprised the following components:

| Amount | Explanation |
|---|---|
| $ 2,050.00 | Per judgment in *Adamo* Action, described above. |
| $20,630.00 | Per judgment in *Adamo* Action, described above. |
| $ 7,800.00 | Per judgment in *Adamo* Action, described above. |
| $22,640.52 | Representing the attorneys' fees and costs awarded in the judgment in the *Adamo* Action, described above, but not the $3,520 in accounting costs awarded in that judgment. |
| $13,598.42 | Per judgment in *Adamo* Action. The August 26, 1996 Report of Auditors found that Peter paid this amount on behalf of Race Place subsequent to April 11, 1995 in respect of taxes, utilities and fuel, insurance, miscellaneous and sales tax liability, "which sum should be allowed and classified as a loan from Adamo to the corporation" (Report of Auditors ¶ 4). This $13,598.42 was included as an element of the money damage award in the *Race Place* Action |

judgment. The $13,598.42 element was included in the *Adamo* Action judgment as an amount which Race Place owed to Adamo, but not as part of Peter's money judgment against Robert in the *Adamo* Action.

| | |
|---|---|
| $66,988.94 | Total per judgment [1] |

plus

| | |
|---|---|
| $ 4,626.60 | Attorneys' fees and costs incurred by Race Place in the *Race Place* Action and allowed as part of the judgment. |
| $10,000.00 | Punitive damages awarded as part of the judgment. |
| $81,614.94 | Total money judgment including attorneys' fees and punitive damages, using the $66,988.94 figure. |

### Discussion

### 1. The Governing Law

■ To prevail on a claim of non-dischargeability under Section 523(a), the party asserting non-dischargeability must prove each element by a "preponderance of the evidence." *Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Plaintiffs rely on subsections (4) and (6) of Section 523(a). These subsections and other relevant authorities will be examined before returning to the facts.

#### A. Section 523(a)(4)

Section 523(a)(4) provides:

(a) discharge under section 727 . . . does not discharge an individual debtor from any debt—

---

1. The actual judgment. Exhibit 20, gives this figure. The list of the component elements of the judgment, Exhibit 19, totals $66,718.94, a discrepancy of $270. The discrepancy is not explained or even noted in the evidence or by counsel.

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

The phrase "defalcation while acting in a fiduciary capacity" requires analysis of the meaning of the terms "defalcation" and "fiduciary capacity." Alternatively, the Court must consider whether "embezzlement" or "larceny," construed under federal law, may apply to the facts here.

### 1. *Fiduciary capacity*

Before reaching the question of whether a defalcation has occurred, it must first be determined that the debtor was acting in a fiduciary capacity. *The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 170 (2d Cir. 1999).

■■■ "Fiduciary capacity" as used in Section 523(a)(4) applies only to trusts existing prior to the wrongful conduct which created the debt. In other words, the statute applies to express or technical trusts but not to trusts *ex maleficio*. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934). State law is to be consulted to determine when a trust in this strict sense exists. *Zohlman v. Zoldan*, 226 B.R. 767, 773 (S.D.N.Y.1998).

The Connecticut state law which would create a fiduciary relationship as to this debtor is identical to the Uniform Partnership Act of 1914, as is the law of New York and numerous other states. This section, entitled "Partner accountable as a fiduciary," states in relevant part:

(1) Every partner must account to the partnership for any benefit, and hold as

trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

Uniform Partnership Act § 21, 7 Uniform Laws Annotated.[2] Federal courts have held that even if this section, standing alone, does not create an express or technical trust, the state courts have "raised the duties of partners beyond those required by the literal wording of [the statute]." *Ragsdale v. Haller*, 780 F.2d 794, 796–97 (9th Cir.1986); *Zohlman v. Zoldan*, 226 B.R. at 774; *In re Stone*, 94 B.R. 298, 303 (S.D.N.Y.1988); *Walters v. Sawyer (In re Sawyer)*, 130 B.R. 384, 397 (Bankr. E.D.N.Y.1991) ("In this Circuit, that a partner is a fiduciary in New York for the purposes of Section 523(a)(4) is now settled law.") (citing *In re Stone, supra*). In this Circuit, state courts have elevated the duties of partners to accord with the words of Chief Judge Benjamin Cardozo in *Meinhard v. Salmon*, in holding that partners "owe to one another, while the enterprise continues, the duty of the finest loyalty." 249 N.Y. 458, 463–64, 164 N.E. 545 (1928).

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.

*Id.* at 464, 164 N.E. 545. *See Zohlman v. Zoldan*, 226 B.R. at 774 (citing *Meinhard v. Salmon*), *Konover Development Corp.*

---

**2.** *See also* General Statutes § 34–59(1) of the Connecticut Uniform Partnership Act, *repealed by* 1995, P.A. 95–341, § 57, eff. July 1, 1997; Cal.Corp.Code § 15021, *repealed by* Stats. 1996, c. 1003 (A.B. 583), S1.2. eff. Jan.

1, 1999; N.Y. Partnership Law § 43. Connecticut and California have repealed the Uniform Partnership Act of 1914 and adopted the Uniform Partnership Act of 1994.

*v. Zeller,* 228 Conn. 206, 218, n. 9, 635 A.2d 798 (1994) (Connecticut Uniform Partnership Act "was intended to incorporate the fiduciary relationship as described by Chief Judge Benjamin Cardozo in *Meinhard v. Salmon* "); *Dzen v. Dzen,* 1999 WL 130545, at *7 (Conn.Super.1999).

By contrast, an employee does not· ordinarily act in a fiduciary capacity toward his or her employer. *Irving Trust Co. v. Deutsch,* 73 F.2d 121, 125 (2d Cir.1934), *cert. denied,* 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243 (1935); *Lind v. Vanguard Offset Printers, Inc.,* 857 F.Supp. 1060, 1067 (S.D.N.Y.1994); *Novartis Corp. v. Luppino (In re Luppino),* 221 B.R. 693, 699 (Bankr.S.D.N.Y.1998) (citing cases).

### 2.  *Defalcation*

■  "[M]ere negligence, without some element of intentional wrongdoing, breach of fiduciary duty or other identifiable misconduct, does not constitute a 'defalcation' within the meaning of section 523(a)(4)." *In re Ellenbogen,* 218 B.R. 709, 716 (Bankr.S.D.N.Y.1998). While something more than mere negligence by a fiduciary is required, a defalcation need not rise to the level of fraud, embezzlement, or misappropriation. *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 512 (2d Cir.1937).

> While defalcation may not require actual intent, nor may it rise to the level of misappropriation, it does require some level of mental culpability. The purpose of Section 523 was to remove from the debtor's capacity the ability to discharge certain debts arising from practices Congress deemed so pernicious that bankruptcy should not insulate the debtor from their payment. For our purposes, defalcation is "willful neglect," essentially a standard of recklessness or at least gross negligence.

*Zohlman v. Zoldan,* 226 B.R. at 777 (citations omitted).

### 3.  *Embezzlement, larceny*

■  "[S]ection 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement." 4· L. King, COLLIER ON BANKRUPTCY ¶ 523.10[2] at 523–77 (15th Ed. rev.1998).

■  The question of what constitutes embezzlement or larceny within the meaning of § 523(a)(4) is a question of federal law. *Great American Insurance Co. v. Graziano (In re Graziano),* 35 B.R. 589 (Bankr.E.D.N.Y.1983); *Moonan v. Bevilacqua (In re Bevilacqua),* 53 B.R. 331 (Bankr.S.D.N.Y.1985); *Congress Financial Corp. v. Levitan (In re Levitan),* 46 B.R. 380 (Bankr.E.D.N.Y.1985).

■  Larceny is the (1) wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with intent to convert the property. *In re Graziano,* 35 B.R. at 594; COLLIER ON BANKRUPTCY, *supra* ¶ 523.10[2] at 523–76.

■  Embezzlement involves many of the same elements: (1) entrustment to the debtor of (2) property (3) of another (4) which the debtor appropriates for his or her own use (5) with intent to defraud. *In re Bevilacqua,* 53 B.R. at 333–34; *In re Graziano,* 35 B.R. at 594 (citing *Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895)); John P. Ludington, Annotation, *Bankruptcy: what constitutes embezzlement of funds giving rise to nondischargeable debt under 11 U.S.C.A. § 523(a)(4),* 99 A.L.R.Fed. 124 (1990).

"Larceny does not differ from embezzlement except with respect to the manner in which the funds or property come into possession of a party." *In re Graziano,* 35 B.R. at 594. To constitute embezzlement, the original taking of the property must be lawful, *i.e.,* with the consent of the owner. COLLIER ON BANKRUPTCY, *supra* ¶ 523.10[2] at 523–76 (citing Black's Law Dictionary 522 (6th Ed.1990)). On the other hand, to constitute larceny the unlawful intent must exist at the time of the original taking. *Id.* A debtor need not have been a fiduciary to commit embezzlement under Section 523(a)(4). *In re Bevilacqua,* 53 B.R. at 334; *Moreno v. Schwartz (In re Schwartz),* 36 B.R. 355, 358 (Bankr.E.D.N.Y.1984).

The first element, whether the property was originally entrusted to the debtor (constituting embezzlement) or taken unlawfully (and therefore larceny), is not frequently litigated, since either factual scenario can be used to prove that the debt is non-dischargeable; therefore, it would not benefit the debtor to show that he or she was guilty of larceny rather than embezzlement (or vice versa). 99 A.L.R.Fed. 124 (1990). Second, the debtor must have wrongfully appropriated or taken "property." Property is not limited to cash or the equivalent. Third, the property misappropriated or converted must be that "of another," since one cannot embezzle or convert one's own property. *In re Levitan,* 46 B.R. at 387; *Barristers Abstract Corp. v. Caulfield,* 192 B.R. 808, 819 (Bankr.E.D.N.Y.1996). Fourth, the debtor must have misappropriated the property for his or her own use or taken the property without the owner's consent. *See Gore v. Kressner (In re Kressner),* 206 B.R. 303, 314 (Bankr.S.D.N.Y.1997); *Barristers Abstract Corp. v. Caulfield,* 192 B.R. at 818. The fifth and final element is "fraudulent intent"—the intent to defraud a creditor of

his or her property. *In re Schwartz,* 36 B.R. at 358; *In re Graziano,* 35 B.R. at 595. The debtor may not defend on the ground that he only intended to deprive the owner of his or her property temporarily. *In re Bevilacqua,* 53 B.R. at 334.

A partner who diverts partnership funds for his or her own use commits embezzlement within the meaning of Section 523(a)(4). *Gateway Star, N.V. v. Zumwalt (In Re Zumwalt),* 53 B.R. 277, 281 (Bankr.D.Or.1985); *Weigend v. Chwat (In re Chwat),* 203 B.R. 242 (Bankr. E.D.Va.1996). Embezzlement also applies to an employee who intentionally misappropriates his or her employer's funds. *See In re Graziano,* 35 B.R. 589 (Bankr. E.D.N.Y.1983), *Chicago Midwest Credit Service Corp. v. Trovato (In re Trovato),* 145 B.R. 575, 581 (Bankr.N.D.Ill.1991).

## B. *Section 523(a)(6)*

Section 523(a)(6) provides that a discharge under Section 727 does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

"The word 'willful' in subsection (6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

"Malicious" as interpreted in this Circuit, can be actual or constructive malice. *Navistar Financial Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84 (2d Cir. 1996); *Rupert v. Krautheimer (In re Krautheimer),* 210 B.R. 37, 48 (Bankr. S.D.N.Y.1997). "The term 'malicious' means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *In re Stelluti,* 94

F.3d at 87 (debtor's transfer of secured creditor's collateral to out-of-state bank accounts was willful and malicious even though she was not aware that the funds belonged to the creditor, because she knew of the debt and drove approximately 60 miles with her husband to transfer the funds to new accounts). *See also Wright v. Bujnowski (In re Wright)*, 209 B.R. 276 (E.D.N.Y.1997) (debtor's conduct was willful and malicious when, with actual knowledge of his obligation to provide medical insurance to his employees, debtor allowed policy to lapse); *In re Berman*, 125 B.R. 74 (Bankr.E.D.N.Y.1991) (debtor acted with malice by withdrawing money from joint bank accounts in anticipation of divorce decree).

To summarize, the statutory element of maliciousness will be found by imputation where the debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff, and, most important, [ ] under some aggravating circumstance such as to warrant denial of discharge.

*Bundy American Corp. v. Blankfort (In re Blankfort)*, 217 B.R. 138, 144 (Bankr. S.D.N.Y.1998).

### C. *Attorneys' fees, costs and punitive damages under Cohen v. De La Cruz*

The Supreme Court has construed the words "any debt," as used in Section 523(a) to apply to any debt which arises from the debtor's act in obtaining specific money or property by fraud under Section 523(a)(2)(A). *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). The Court specifically rejected the notion that a debt for money or property obtained by fraud is limited to the value of the money or property received by the debtor and upheld the bankruptcy court's award of attorneys' fees and treble damages under state law in the Section 523 dischargeability action. *Id.* at 219, 118 S.Ct. 1212.

"*Cohen v. de la Cruz*, therefore, stands for the proposition that where attorneys' fees are available outside bankruptcy as a matter of law, then they are available inside bankruptcy in a dischargeability proceeding as well." *Buffalo GYN Womenservices, Inc. v. Behn (In re Behn)*, 245 B.R. 444, 447 (Bankr.W.D.N.Y.2000).

In *de la Cruz*, the Supreme Court read Section 523(a)(2)(A) *in pari materia* with other non-dischargeability sections, including Sections 523(a)(4) and 523(a)(6).

Because each use of "debt for" in § 523(a) serves the identical function of introducing a category of nondischargeable debt, the presumption that equivalent words have equivalent meaning when repeated in the same statute . . . has particular resonance here.

523 U.S. at 220, 118 S.Ct. 1212 (citations omitted). *See also Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 262–63 (Bankr. S.D.N.Y.2000) (holding that the reasoning in *de la Cruz* applies to attorneys' fees incurred as a result of conduct giving rise to a non-dischargeable debt under Section 523(a)(6)).

Attorneys' fees awarded in a judgment obtained prior to the bankruptcy proceeding have been held non-dischargeable under Section 523(a)(6). *In re Behn*, 245 B.R. at 447. Furthermore, the court in *In re Behn* reasoned that where the Section 523 proceeding is simply a " 'rehash' of what was previously proven-up by the plaintiff" in state court, then "the § 523 proceeding . . . must be viewed as something akin to a proceeding 'in aid of' the pre-bankruptcy litigation." *In re Behn*, 245 B.R. at 447–48.

**56**

### D. *Connecticut civil conspiracy*

■ Under Connecticut law, a cause of action for civil conspiracy is: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff. *Williams v. Maislen,* 116 Conn. 433, 165 A. 455, 456 (1933); *Marshak v. Marshak,* 226 Conn. 652, 655, 628 A.2d 964 (1993); *Gamlestaden PLC v. Backstrom,* 1995 WL 326047 (Conn.Super.1995); *Novak v. Sherman (In re Reilly),* 262 B.R. 197, 202 (Bankr. D.Conn.2001).

■ "The gist of a civil action for conspiracy is not conspiracy as such, without more, but the damage caused by the acts committed pursuant to the formed conspiracy." *Governors Grove Condominium Assoc., Inc. v. Hill Development Corp.,* 36 Conn.Supp. 144, 151, 414 A.2d 1177 (1980). "There must be something done pursuant to the conspiracy which harms the plaintiff." *Id.*

### II. *Section 523(a)(4) and the Connecticut judgments*

#### A. *The Adamo judgment against Robert*

■ Preliminarily, I conclude that Robert was acting in a fiduciary capacity in connection with his handling of the property of Race Place. It is true that in many respects a partner, or a shareholder, or an officer or director, will not be deemed to be in a fiduciary or trust relationship with his partners, fellow shareholders or the corporate entity, in their arm's length or contractual dealings with each other. But when a partner or corporate insider has or obtains custody or control over partnership property, he stands

in a position of trust with respect to that property, and he owes a fiduciary duty to his partner, or the other shareholders of his corporate entity, with respect to the partnership or corporate property entrusted to him. *Konover Development Corp. v. Zeller,* 228 Conn. 206, 218, n. 9, 635 A.2d 798 (1994); *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928); *Zohlman v. Zoldan,* 226 B.R. 767, 773 (S.D.N.Y.1998); *Walters v. Sawyer (In re Sawyer),* 130 B.R. 384, 397 (Bankr.E.D.N.Y.1991).

Such was the case in respect to the Race Place property here involved. Without question, the allegations against Robert, concerning the $2,050 check and Missing Inventory, refer to acts which occurred during the life of the Race Place enterprise, the period in which Robert owed Peter "the duty of the finest loyalty." *Meinhard v. Salmon,* 249 N.Y. at 463–64, 164 N.E. 545.

#### 1. *The $2,050 check*

■ The facts regarding this check are not in dispute. By any definition of "defalcation," the misappropriation of this $2,050 of Race Place funds by Robert, Anita and Irene and the use of the money for Robert's personal benefit constituted defalcation. At the very least, Robert's act was an "identifiable misconduct" and included elements of intentional wrongdoing sufficient for a finding of defalcation. It certainly exceeded "mere negligence." *See Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 512 (2d Cir.1937), *Zohlman v. Zoldan,* 226 B.R. 767, 777 (S.D.N.Y.1998); *In re Ellenbogen,* 218 B.R. 709, 716 (Bankr.S.D.N.Y.1998).

Alternatively, the misappropriation of these funds also constituted "embezzlement" within the meaning of subsection (4). The funds were property of Race Place which had been entrusted to Robert. Robert intentionally appropriated these

funds for his personal benefit. *See Gateway Star, N.V. v. Zumwalt (In re Zumwalt)*, 53 B.R. 277 (Bankr.D.Or.1985) (general partner's withdrawal of partnership funds to satisfy debts and obligations of his corporation, with knowledge that he had no authority to divert such funds, constituted embezzlement).

### 2. *The $20,630 Missing Inventory*

There is a fact dispute over the events of April 11 and the Missing Inventory. In a nutshell, Peter testified that he observed Robert, Anita and Irene physically removing the Missing Inventory in bags on April 11. Robert and Anita deny that they removed the Missing Inventory. The conflict must be resolved against Robert and Anita for two reasons.

First, the issue is foreclosed by collateral estoppel. The Supreme Court has held that collateral estoppel principles apply in proceedings under Section 523(a). *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Under the "full faith and credit" statute, 28 U.S.C. § 1738, a bankruptcy court must "refer to the preclusion law of the State in which the judgment was rendered." *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).

Under Connecticut law, collateral estoppel applies to an issue that was (1) actually litigated and (2) necessarily determined in a prior action between the same parties on a different claim. *Meehan v. Town of East Lyme*, 919 F.Supp. 80, 85 (D.Conn.1996); *Fed. Deposit Ins. Corp. v. Roberti (In re Roberti)*, 201 B.R. 614, 618 (Bankr.D.Conn.1996); *Spartz v. Cornell (In re Cornell)*, 178 B.R. 45, 48 (Bankr.D.Conn.1995); *Commissioner of Motor Vehicles v. DeMilo & Co.*, 233 Conn. 254, 267, 659 A.2d 148 (1995) (quoting *Aetna Casualty & Surety Co. v. Jones*, 220 Conn. 285,

296, 596 A.2d 414 (1991)); *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 627 A.2d 374 (1993).

"An issue is 'actually litigated' if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." *Carol Management Corp. v. Board of Tax Review*, 228 Conn. 23, 32, 633 A.2d 1368 (1993) (quoting 1 Restatement (Second) of Judgments § 27 cmt. d (1982)).

An issue is "necessarily determined" if, "in the absence of a determination of the issue, the judgment could not have been validly rendered." *Jackson v. R.G. Whipple, Inc.*, 225 Conn. at 714–15, 627 A.2d 374 (citations and internal quotation marks omitted). "An issue may be actually decided even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached." *Putnam Resources v. Frenkel & Co., Inc.*, 1995 WL 416194, at *4 (Conn.Super.1995) (citations and internal quotation marks omitted).

Both requirements for collateral estoppel are present here. The issue of the Missing Inventory was actually litigated and necessarily decided before the auditors in the *Adamo* Action. There is no dispute that the Missing Inventory was not missing when Race Place closed up for the night on April 10. Indeed, Robert testified that when he broke into the premises on the morning of April 11 nothing was missing and "everything looked like it was in its proper place" (Tr. 414; *see also* Tr. 449). There was no evidentiary suggestion in the trial record and no contention by defendants that any of the Missing Inventory went missing before April 11. Robert offered no evidence and his counsel made no argument that all or any of the Missing Inventory went missing for any reason other than the actions of Robert, Anita and

58

Irene carrying it off in bags on April 11. In answer to questions by this Court, Robert acknowledged that the events of April 11 were the subject of the hearing before the auditors. *See* Tr. 452–453. The Report and Corrected Report of the Auditors were adopted by the Connecticut Superior Court and resulted in the judgment for $20,630 against Robert on account of the Missing Inventory. Lacking any ground other than the April 11 events as a basis for the $20,630 judgment for Missing Inventory, the auditors and the Connecticut Superior Court must necessarily have decided the issue of whether Robert, Anita and Irene walked off with the Missing Inventory on April 11. Robert had a full and fair opportunity to litigate the issue in the Connecticut Superior Court. He also had ample opportunity in this Court to show that the issue of the April 11 events was not decided in the Connecticut Superior Court, and he made no such argument. Having litigated and lost in the Connecticut Superior Court, Robert and Anita may not relitigate the issue in this Court. The doctrine of collateral estoppel bars this Court from making a finding of fact in this case contrary to that made in the Connecticut case.

Second, even absent collateral estoppel, I find as a matter of fact that Peter has sustained the burden of proof with respect to the events of April 11. Peter testified that Race Place was fully stocked with slot cars and other inventory when it closed the night of April 10; that he physically witnessed Robert, Anita and Irene and a few helpers removing bag after bag of stuff from the Race Place premises on April 11, putting the bags in the Schellers' van and truck and driving off with the bags; and that immediately thereafter he inspected the premises inside and observed that every movable item in the premises had been cleaned out. The Schellers never disputed that the Missing Inventory was on the premises when Race Place closed on April 10, and they did not offer any testimony or other evidence that the Missing Inventory was still there when they finally left the premises on April 11. They simply denied that they took anything, without offering any evidence or hypothesis as to how the Missing Inventory disappeared. I find Peter's testimony as to the April 11 events to be entirely credible. It was corroborated by the testimony of Gregory Pieck, and it is the only possible explanation of how the Missing Inventory disappeared. The testimony of Robert and Anita denying that they removed the Missing Inventory on April 11 cannot be reconciled with the undisputed facts that the Missing Inventory was present at the close of business on April 10 and missing at the end of the day on April 11, and I reject their testimony as not worthy of belief on the trial record before me.

■ Upon the foregoing findings, I conclude that Robert's removal of and failure to account for the Missing Inventory constituted defalcation while acting in a fiduciary capacity within the meaning of subsection (4).

In the alternative, the misappropriation of the Missing Inventory constituted "embezzlement" within the meaning of subsection (4). *See Weigend v. Chwat (In re Chwat),* 203 B.R. 242 (Bankr.E.D.Va.1996) (former partner's removal of partnership property from premises after leaving partnership and refusal to return such property constituted embezzlement). The Missing Inventory was property belonging to Race Place. As the day-to-day operator of Race Place, Robert was entrusted with its safekeeping. His act of carrying away the Missing Inventory in bags was an unmistakable and intentional act of misappropriation.

**B. *The Race Place judgment against Anita***

■ Although she was a key employee (albeit unpaid) of Race Place, Anita was neither a partner nor co-venturer of Peter's, and she was not an officer, director or shareholder of Race Place. Accordingly, I conclude that Anita was not within the scope of the term "fiduciary" as used in subsection (4). *Irving Trust Co. v. Deutsch*, 73 F.2d 121, 125 (2d Cir.1934); *Lind v. Vanguard Offset Printers, Inc.*, 857 F.Supp. 1060, 1067 (S.D.N.Y.1994); *Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 699 (Bankr.S.D.N.Y. 1998) (management level employee did not act in a fiduciary capacity).

■ However, Anita was an active participant in the misappropriation of the $2,050 check and the Missing Inventory, as the Connecticut Supreme Court necessarily determined in rendering judgment against her on these items under the civil conspiracy statute. For reasons already set forth, her conduct in both respects constituted "embezzlement" within subsection (4), rendering the compensatory damages portion of the Race Place judgment against her non-dischargeable. As an employee of Race Place, the Missing Inventory, and especially the books and records, had been entrusted to her. Anita's conduct on April 11 constituted an intentional misappropriation of the $2,050 check and Missing Inventory. *See In re Graziano*, 35 B.R. 589 (Bankr.E.D.N.Y.1983) (debtor-salesman-employee intentionally misappropriated funds where accounts reflected a deficit of approximately $775,000 and the debtor systematically misrepresented to employer the amounts at which sales had been consummated); *Chicago Midwest*

*Credit Service Corp. v. Trovato (In re Trovato)*, 145 B.R. 575 (Bankr.N.D.Ill. 1991) (employee committed embezzlement by negotiating with other companies to reduce the percentage of commissions his employer would be required to pay, then diverting the savings for his personal use).

**III. *Section 523(a)(6) and the Connecticut Judgments***

■ There is no question that the conduct of Robert and Anita in respect of the $2,050 and the Missing Inventory was "intentional" by any standard. I conclude that their conduct was also "malicious" within the meaning of subsection (6). The Second Circuit decision in *Navistar Financial Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84 (2d Cir.1996) involved strikingly similar facts.

In *Stelluti*, the Second Circuit imputed malice to the acts of Joanne Stelluti, a debtor who was employed as a bookkeeper for Crossroads Truck Center, Inc. ("Crossroads"), a corporation owned by her co-debtor husband. A dispute arose between Crossroads and Navistar Financial ("Navistar"), a creditor secured by the proceeds of Crossroads' truck sales. After Mr. Stelluti learned from another dealer that Navistar was getting ready to "pull the plug" on Crossroads, the debtors withdrew all of the proceeds from Crossroads' operating accounts in New Jersey. *Id.* at 85. Some of the funds were deposited by Ms. Stelluti in a new account in Connecticut. The Court found that although Ms. Stelluti may have been unaware that the funds belonged to Navistar, she was aware of the debt to Navistar and the dispute between her husband and Navistar.[3] When these

3. The Bankruptcy Court granted Navistar summary judgment in its action against Mr. Stelluti under Section 523(a)(4) and (6) based upon collateral estoppel effect of a judgment

in the United States District Court for the District of New Jersey against Mr. Stelluti for conversion, malicious interference with contract, and unjust enrichment by the receipt of

facts were taken together with her affirmative acts, "there was no other purpose for their conduct except to harm the interests of Navistar Financial" and under those circumstances, Ms. Stelluti's actions in transferring the funds were impliedly malicious. *Id.* at 88.

The facts in this case appear even more compelling than those in *Stelluti* on the issue of "malicious injury." Like Ms. Stelluti, Anita worked as a bookkeeper, and was neither an officer, partner nor shareholder. Anita wrote the $2,050 check on the Race Place account and assisted her husband in removing the Missing Inventory. Anita knew that the $2,050 check and Missing Inventory were property belonging to the Race Place business. Her conduct on April 11 could have had no other purpose except to harm Peter's interest in Race Place.

On the facts in this case, I conclude that the compensatory damage awards totaling $22,680 in both Connecticut judgments were non-dischargeable under subsection (6) of Section 523(a) as to both Robert and Anita.

#### IV. *Attorneys' Fees, Auditors' Fees, Expenses and Punitive Damages under De La Cruz*

■ Under the Supreme Court decision in *de la Cruz*, it is clear that all of the other components of Peter's judgment against Robert in the *Adamo* Action fall within the scope of attorneys' fees, costs and expenses incurred by Peter in vindicating his compensatory damage awards aggregating $22,680 for the $2,050 check and the Missing Inventory. As such, these components of the judgment are not subject to discharge under *de la Cruz* because they are part of the "debt" which

trust proceeds. *Navistar Financial Corp. v. Stelluti (In re Stelluti)*, 163 B.R. 699 (Bankr.

arose from Robert's defalcation, embezzlement, and willful and malicious injury. *See de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341; *In re Kovler*, 249 B.R. 238, 262-63.

The same conclusion must be reached with respect to the non-compensatory components of the Race Place judgment against Anita, with two exceptions.

■ First, counsel has advised the Court that the $10,000 punitive damage award was granted pursuant to the Connecticut Unfair Trade Practices Act. Since it is not evident to me how this statute was implicated by the Schellers' conduct with regard to either the $2,050 check or the $20,630 of Missing Inventory, I find no basis to hold this award non-dischargeable under the rationale of the *de la Cruz* case.

■ Second, the Race Place judgment against Anita included an item of $13,598.42 for "Loan expense incurred per auditors' report and judgment in CV 95-0320468 S [the *Adamo* Action]." As amplified in paragraph 4 of the auditors' Report dated August 26, 1996, the $13,598.42 represented amounts paid by Peter on behalf of Race Place after April 11, 1995 in respect of taxes, utilities and fuel, insurance, miscellaneous and sales tax liability. These $13,598.42 of expenditures, in and of themselves, do not constitute a "debt—... (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny [or] ... (6) for willful and malicious injury by the debtor to another entity or to the property of another entity." Hence, these expenses are not within the scope of either subsection (4) or (6) of Section 523(a). Nor do they constitute expendi-

S.D.N.Y.1994).

tures incurred by either Peter or Race Place in connection with litigation to establish the non-dischargeability of another debt within the scope of Section 523(a). Thus, these expenses cannot be held non-dischargeable under the rationale of the *de la Cruz* case.

### V. *Miscellaneous Contentions*

Robert attempted to justify his misappropriation of the $2,050 by asserting that he needed to retain counsel to represent the corporation in the *Adamo* Action, since Race Place was named as a defendant. The contention borders on the frivolous. It is crystal clear on the face of the complaint that Race Place is named only as a nominal defendant, that the only wrongdoing alleged is that of Robert, and that the only relief sought is against Robert personally, except the remedy of corporate dissolution in respect of which Race Place was a necessary, albeit passive or nominal, defendant. Robert, using the services of Anita and Irene, appropriated the $2,050 solely for himself, not for the benefit of Race Place.

Defendants argued at length that there was no corporation Race Place of Danbury, Inc. (viz, no stock was issued, no formal meeting of shareholders was held, no directors or officers were elected, etc.), and that the relationship of Robert and Peter was that of partners or joint venturers in respect of the slot car business operated under the name Race Place of Danbury, with each having a 50% interest in the business. Putting aside Peter's explana-

tion that shares of stock were not issued and the corporate formalities were not observed because Anita had possession of the corporate kit, and further putting aside the fact that the issue could and should have been litigated in the *Adamo* Action and the *Race Place* Action,[4] the principal response to defendants' argument on corporate status is that it does not matter. It does not make any difference for purposes of dischargeability under Sections 523(a)(4) and (6) whether Peter and Robert carried on their slot car business under the umbrella of a corporate entity, with presumed limited liability to third parties, or as a technical "partnership" under Connecticut's version of the Uniform Partnership Act, or as an unincorporated, informal joint venture, partnership or d/b/a. Regardless of the formal business structure or label, there is no dispute on the substance of the parties' enterprise. While they may disagree as to whether Robert's capital contribution was to be "sweat equity" or financial (an issue which may have been important in the Connecticut actions but is of no significance in these adversary proceedings), both agree that each was intended to be a 50% owner of the Race Place business, be it a corporation, partnership or joint venture. As such, neither Peter nor Robert had the right to appropriate for himself property belonging to the business venture. There is no dispute that the $2,050 and the $20,630 of Missing Inventory constituted property of the Race Place business venture. The Connecticut Superior Court determined that Robert and Anita were liable for converting that

---

**4.** If the corporate status issue had any significance, it would appear to be foreclosed by reason of the judgments in the *Race Place* Action, in which Race Place was the plaintiff, and the *Adamo* Action, in which Race Place was a nominal defendant. The judgments of the Connecticut Superior Court in both actions fixed the rights and liabilities of the respective parties, including the corporate en-

tity. If the issue was raised by the Schellers in the Connecticut litigation, it was resolved against them by the Connecticut Superior Court. If it was not raised, it is too late to do so in these adversary proceedings, because this Court is bound to give full faith and credit to the Connecticut judgments which are the subject of these proceedings.

property to their own use. Defendants' counsel has not identified the significance of the contention that Race Place was not a corporation, either in these adversary proceedings or (evidently) in the Connecticut litigation. But even if the issue were significant, it was foreclosed by the Connecticut judgments.

■ The Schellers have argued at length in their trial memorandum and at the trial hearing that plaintiffs' attorneys, Sienkiewicz & McKenna, had an ethical problem with two dimensions. First, Sienkiewicz & McKenna should have been disqualified from representing Peter in his litigation against Robert because the firm had represented both Peter and Robert in the formation of Race Place of Danbury, Inc. Second, Sienkiewicz & McKenna could not ethically represent Race Place as a plaintiff in the *Race Place* Action while at the same time suing Race Place as a defendant in the *Adamo* Action. Because of these purported ethical violations, the sellers argue that Sienkiewicz & McKenna's clients, Peter and Race Place, should be barred as a matter of equity from the relief of non-dischargeability which they seek in these adversary proceedings.

The ethics argument has no merit. No motion was ever made by the Schellers in the Connecticut Superior Court actions or in these adversary proceedings to disqualify Sienkiewicz & McKenna, and it is doubtful that any such objection would have been sustained either by the Connecticut court or this Court under the circumstances here present. Sienkiewicz & McKenna were always Peter's counsel. Neither the Schellers nor anybody on the Schellers' behalf communicated or met with Sienkiewicz & McKenna, confidentially or otherwise. Although the firm did the simple paperwork to incorporate Race Place, the firm never acted as attorneys for Robert, or even as counsel for both

Peter and Robert. The firm never did any legal work (such as drafting a shareholders agreement or other form of joint venture or partnership contract) such as would have required conferences with Robert or a knowledge of Robert's business affairs or his objectives. Nor was there any ethical taint in Sienkiewicz & McKenna bringing the *Adamo* Action in which Race Place was named as a defendant, since no claim was asserted nor relief demanded against Race Place, which was named simply as a necessary but nominal party, with no interests of its own to protect separate and apart from the interests of the actual combatants, Peter and Robert. Finally, even assuming that there were a basis to find ethical impropriety on the part of Sienkiewicz & McKenna, such impropriety cannot be asserted as a defense to the claims in these adversary proceedings by Peter on behalf of himself and Race Place, particularly where the Schellers never previously objected to Sienkiewicz & McKenna's alleged conflict and were not harmed by it.

■ Finally, the Schellers argue in their post-trial memorandum that it would be unfair and inequitable to deny dischargeability of the Connecticut judgments because it was Peter who was the wrongdoer since he, not the Schellers, precipitated the events of April 11, 1995 by wrongfully locking the Schellers out and destroying what had been a promising and successful business. The problem with this argument is that it is addressed to the wrong court. Peter, Robert and Anita had their day in court in the two Connecticut actions. Any claims that Robert and Anita had with respect to the events of April 11 or otherwise with respect to the parties' conduct of their slot car business joint venture could and should have been litigated in the Connecticut actions. Those actions were fully litigated to judg-

ments, and those judgments are before this Court as fait accompli which must be accorded full faith and credit by this Court. The issues before me in these adversary proceedings are confined to whether the statutory elements for non-dischargeability under subsections (4) and (6) of Section 523(a) have been met. The claim that Peter committed wrongdoing on April 11 by locking Robert out and destroying the Race Place slot car business could only be adjudicated by the Connecticut Superior Court, which rendered judgments adjudicating the parties' rights and liabilities arising from the events of April 11. Such a claim cannot be invoked as a defense to a claim of non-dischargeability with respect to those judgments.

### Conclusion

Plaintiff Peter Adamo is entitled to an order and judgment in this adversary proceeding declaring non-dischargeable the entire money judgment in the *Adamo* Action in the total sum of $57,299.52.

Peter is entitled to an order and judgment in this adversary proceeding on behalf of Race Place declaring non-dischargeable the money judgment against Anita in the *Race Place* Action to the extent of $58,016.52, comprising the entire amount of the Race Place judgment, including the $270 discrepancy, but excluding the $13,598.42 in respect of Race Place expenses incurred after April 11, 1995 and excluding the $10,0000 punitive damage award.

Counsel for plaintiffs is instructed to promptly prepare an appropriate order consistent with this Decision and fax it to defendants' counsel for approval as to form (without prejudice to defendants' rights of appeal). In the event of any dispute as to the form of the Final Order and Judgment, counsel are ordered to present the precise point(s) of dispute to the Court in a telephone conference for prompt resolution by the Court.